No. 18,812.

DAVID CASTRO *v.* PEOPLE OF THE STATE OF COLORADO.
(346 P. [2d] 1020)

Decided November 2, 1959. Rehearing denied December 14, 1959.

494

Mr. EDWARD H. SHERMAN, for plaintiff in error.

Mr. DUKE W. DUNBAR, Attorney General, Mr. FRANK E. HICKEY, Deputy, Mr. GERALD HARRISON, Assistant, for defendant in error.

*En Banc.*

MR. JUSTICE DOYLE delivered the opinion of the Court.

PLAINTIFF in error, the defendant in the district court, seeks reversal of a verdict, judgment of conviction and life sentence on a charge that on May 13, 1957, he killed and murdered Celedonia Castro.

The evidence disclosed that the decedent had been the wife of the defendant but had been finally divorced from him for some period of time prior to May 13, 1957. On that date defendant appeared in the vicinity of 2900 West Colfax in Denver at approximately 5:45 A.M. This was the place of employment of the deceased. Defendant talked to various people, applied for a job and then waited until his former wife appeared at 7:00 A.M. on her way to work. He then accosted her and after some argument stabbed her numerous times and she died immediately following this attack.

Testimony elicited on cross-examination of the people's witnesses indicated that the defendant was upset and distraught just prior to the attack. Immediately

following the stabbing defendant struggled with witnesses who sought to restrain him and proclaimed his love for his wife and his desire to kiss her. Evidence was introduced on the people's case in chief to establish that at the time of the homicide defendant was able to premeditate and deliberate; that he knew right from wrong and had the ability to choose the right and refrain from the wrong. Three psychiatrists called by the people. so testified.

Officers who were called to the scene of the homicide were allowed to testify to the oral declarations, admissions and confessions which the defendant made at the time. He was asked by one of the officers: "Did you do this?" He answered: "Yes." He was then asked why he had done it and he stated that he "had warned her not to go out with that other guy." Another officer who testified to interrogating the defendant at the scene, stated that the defendant had cried three different times while he was being interrogated. Over objection of the defendant that this statement was not voluntary, the court permitted the officer to testify:

"He stated: 'I saw her coming down one side of street. I crossed over and met her. We argued about the dance last night at Soderstrums'. She laughed at me. I didn't want to do it and I told her not to go out with those other guys; I wish it could have been Vasquez. I love her so much, I was not going to let any other sons-of-bitch have her.' "

Other officers testified to an oral statement made by the defendant at a later time at the police building at which time he identified the knife which was used in the stabbing as his and said that he carried it with him in his line of work as a butcher and that he had it in his possession the morning in question because he was then applying for a job.

On behalf of the defendant, witnesses testified concerning the marital difficulties between the defendant and decedent from which it appears that decedent was

much younger than the defendant; had been guilty of marital infidelity toward him and had filed a total of five divorce actions, the fifth of which culminated in a decree of divorce approximately 1½ years prior to the homicide.

Defendant testified at the trial that he remembered going to the place in question on the morning of the incident for the purpose of applying for a job, and that he met his former wife there and had an argument with her during the course of which he slapped her. He denied any recollection of having stabbed her, but recalled a man pulling him away from her.

Psychiatric opinion testimony offered on behalf of the accused was to the effect that at the time of the crime the defendant was incapable of distinguishing right from wrong and was unable to refrain from doing the wrong due to mental illness and disease: Drs. Leo Tepley and Jack Hilton testified that these opinions were based upon extensive conversations and examination of the accused and upon the fact that on one occasion the defendant had tried to commit suicide following his being jailed on a complaint by the deceased.

The people's rebuttal testimony was that the defendant had admitted that his suicide attempt was a fake; that he did not really intend to hang himself and that he had threatened the life of the decedent.

The numerous errors assigned include the following:

1. That the evidence at the trial was insufficient in law to constitute murder in the first degree and that it was error for the court to submit a verdict of first degree murder to the jury.

2. That the court erred in receiving in evidence the testimony of the police officers as to conversations constituting admissions and confessions and in allowing rebuttal evidence without proper foundation and which was properly part of the case in chief.

3. That the statutory procedures which were followed

by the court with respect to the issue of insanity were invalid and unconstitutional.

4. That the court erred in following the statutory tests of insanity, i.e., the right and wrong and irresistible impulse tests, and that this action of the court deprived the defendant of his liberty without due process of law and of the equal protection of the laws contrary to the Constitutions of Colorado and the United States.

The above points only are argued in the brief on behalf of the defendants and, although there are numerous other assignments, we do not believe, following a review of these assignments, that they need be discussed.

1. *The question whether the evidence was sufficient.*

Defendant argues that the evidence cannot be interpreted to support a theory and conclusion that the essential element of malice was established. His counsel argues that:

" * * * The record shows clearly that this was a sudden and impulsive killing — it was an instantaneous act of a sudden compulsion, provoked by an accumulation of events and abuses, resulting from a series of provocations and stresses ('there was a tremendous provocation extending over many years before the date of tragedy and certainly the last 48 hours,' Dr. McDonald,) and the indictable act was not thought out or perpetrated with deliberation or premeditation."

In support of his argument, counsel summarizes the testimony indicating that the killing was the result of a sudden impulse as follows:

" * * * One need only draw upon his experiences to see how the facts are inconsistent with premeditation and deliberation; the defendant, applying for a job that morning, his conversations that morning; he is on the street, in broad daylight when he meets his wife; he talks to her next to the store (one witness says he thought they were lovers; suddenly there is shouting and an altercation ensued; the sudden and impulsive acts are described by the witnesses. The frenzy and wild

compulsive acts (Twelve cuts in her body). Even as he is assaulting her, hovering over her, he is crying; he repeats over and over, 'This is my wife; I love her'; as he is pulled off her he keeps insisting, 'I want to kiss my wife,' etc. When he is told she is dead, shortly thereafter he cries: 'Don't say that . . .' and he starts to cry: 'Oh, God, three little boys. Oh, Lord. Can I see a Priest?' He kept on crying. He said, 'Sally, please forgive me. Oh, God, my little Sally, Christ Almighty, Sally. God, please forgive me. Forgive me, Sweetheart.' He does not know what occurred. Then the record points to his demeanor, his confusion, he 'was kind of glassy-eyed' as he sits there and waits for the police."

There was testimony before the jury of a long history of jealousy and bad feeling, including a prior threat. It also appeared that the defendant was carrying the murder weapon on his person. Although he explained this in terms of his applying for a job, this fact was nevertheless susceptible to the inference that he was carrying the knife as a weapon. The undisputed evidence is that he waited for some time until the decedent came to work and that he crossed the street in order to accost her. Other undisputed testimony is that he stabbed her twelve times. In view of this, there can be no doubt as to the sufficiency of the evidence in support of the requisite element of malice. See *Eachus v. People*, 77 Colo. 445, 236 Pac. 1009; *Carlson v. People*, 93 Colo. 570, 27 P. (2d) 745; *Davis v. People*, 112 Colo. 452, 150 P. (2d) 67; *St. Louis v. People*, 120 Colo. 345, 209 P. (2d) 538. The fact that the defendant is able to point to portions of the record supporting his theory of the case does not result in a conclusion that the evidence is insufficient. Evidence to show lack of malice was meager. The conflict (if it can be called a conflict) in the testimony as to whether the killing was malicious justified submission of the cause to the jury. See *Hamby v. People*, 109 Colo. 572, 128 P. (2d) 993. The verdict is amply supported by the evidence.

2. *The question whether the court erred in admitting testimony.*

a. It is argued that the statements, admissions and confessions of the accused were incompetent in that the accused was not warned that he had a constitutional right to refuse to answer the questions propounded. It is to be noted that the trial court carefully screened all of this testimony by conducting a voir dire hearing prior to its being formally offered, and after full hearing ruled that it was admissible.

We are of the opinion that the court did not abuse its discretion in holding that the statements were voluntary. See *Downey v. People,* 121 Colo. 307, 215 P. (2d) 892, wherein the Court (per Mr. Justice Moore) said:

" * * * Before a confession can properly be admitted in evidence in the trial of a person accused of crime, it must be shown that the alleged confession was made voluntarily. 'Whether or not a confession was voluntary, is primarily a question for the trial court. Its admissibility is largely within the discretion of that court; and on review, its ruling thereon will not be disturbed, unless there has been a clear abuse of discretion.' *Osborn and Noakes v. People,* 49 Colo. 316, 112 Pac. 785; *Buschy v. People,* 73 Colo. 472, 216 Pac. 519; *Bruner v. People,* 113 Colo. 194, 156 P. (2d) 111; *Cahill v. People,* 111 Colo. 29, 127 P. (2d) 673."

██ Whether a statement of an accused can be excluded on the ground that it is involuntary generally depends on direct testimony of threats or other coercion or surrounding facts and circumstances which give rise to a conclusion that the statement was involuntary. Here, however, the sole basis for defendant's contention is that the accused was not warned that any statement which he might make could be used against him. We have repeatedly held that failure to give such warning does not result in such statement being involuntary as a matter of law. *Reagan v. People,* 49 Colo. 316, 112 P. 785; *Rogers v. People,* 76 Colo. 181, 230 P. 391; *Cahill v.*

*People,* 111 Colo. 29, 137 P. (2d) 673; *Leick v. People,* 136 Colo. 535, 322 P. (2d) 674. The Court (per Mr. Justice Frantz) said:

" * * * There being no right in one being thus questioned to have the police advise him that he may have counsel and there being no duty to warn him that any statement made by him may be used against him, it becomes obvious that error assigned on those grounds is without merit. * * * "

*Melville, Criminal Evidence* 56 recommends warning of a suspect that his statement may be used against him as better and safer practice but concludes:

"It is well established that a confession voluntarily made is not invalidated or made inadmissible in evidence by reason of the failure of the officers to inform the defendant that his confession might be used against him, Cahill v. People, 111 Colo. 29, 38, although it is better practice to do so. It is not the duty of the police officers to warn the prisoner as to the consequences of the confession; he is required merely to refrain from unlawfully inducing him to make one. Reagan v. People, 49 Colo. 316, 322."

In the case at bar there were no surrounding facts and circumstances which would even suggest that statements were involuntary.

 No error arose from the ruling that the testimony of the witness Alirez given on rebuttal was admissible. The trial court screened this testimony by conducting a voir dire examination of the witness in chambers prior to his testimony in court. This witness, who was deceased's brother, testified that the defendant had told him that he had not intended to hang himself. This was proper rebuttal evidence in view of the fact that it had been offered as a basis for the opinion of defendant's psychiatrists that he was insane. See *Jordan v. People,* 19 Colo. 417, 36 Pac. 218 and *Ingles v. People,* 90 Colo. 51, 6 P. (2d) 455. The testimony of this witness that

the defendant had made a prior threat was also proper rebuttal. See *Ingles v. People* as follows:

" * * * If the evidence is competent and relevant to the issues, appellate courts do not, as a rule, consider the question as to the order in which it was introduced. It is thus said with reference to rulings on the admission of testimony: 'It is firmly settled that the order of proof is committed to the discretion of the trial court, and it is seldom, if ever, that reversible error can be predicated on the exercise of such discretion.' And see *Hardesty v. People,* 52 Colo. 450, 121 Pac. 1023; *Irvine v. Minshull,* 60 Colo 112, 152 Pac. 1150.

"In the circumstances, we do not believe that the court abused its discretion."

3. *The issue whether C.R.S. 1953, 39-8-3, is valid or, in the alternative whether the court applied it so as to deprive the accused of due process of law.*

■ We are of the opinion that the questioned provision is valid and that the rights of the accused were not infringed as the result of any action by the trial court.

In 1957, the Legislature amended the statute prescribing procedures in connection with the entry of a plea of not guilty by reason of insanity. The section which the defendant now claims is unconstitutional reads:

"When a defendant pleads not guilty by reason of insanity at the time of the alleged commission of the crime, and joins with it another plea or pleas not involving insanity, including the plea of not guilty, after the period of observation, the case, in the discretion of the court, may be either set for trial on the insanity issue alone, or may be set for one trial upon all issues raised by all pleas entered." *C.R.S. 1953, 39-8-3 (1) Cum. Supp.*

Counsel for defendant raises three points in support of his argument that the statute is either invalid or was administered in an invalid manner. (1) That the statute invalidly mingles criminal and civil matters and that the joint trial thus deprives the defendant of due process

of law. (2) That the joint trial violates the due process clause, state and federal, and the state prohibition against compulsory incrimination in that psychiatrists testifying with respect to the mental condition of the accused are allowed to describe the statements made by the defendant to the psychiatrists in the course of examinations; that although these statements to psychiatrists are admissible only for the purpose of showing the mental condition of the accused and for the purpose of supporting the conclusion of the psychiatrists, the jury is unable to properly segregate these statements and the resultant confusion and prejudice deprives him of a fair trial. (3) That the trial court erred in receiving the psychiatrists' testimony as part of the people's case in chief; that this is contrary to the statute and is also in violation of due process limitations.

*First,* Although there are statements in concurring opinions to the effect that the insanity procedure is essentially civil even when it is incident to a plea of not guilty by reason of insanity in a criminal case, the decisions of this Court are consistent in their holdings that such procedure is criminal in its nature. In *Leick v. People,* 131 Colo. 352, 281 P. (2d) 806, it was contended that the statute there under review was violative of the federal Constitution and the Constitution of Colorado "because of the intermingling of criminal and civil proceedings in one trial." This contention was there rejected.

In *Becksted v. People,* 113 Colo. 72, 292 P (2d) 189, the Court dealt specifically with the issue of whether an insanity trial is criminal or civil and held it to be criminal. It was there said:

" * * * In a criminal case the defendant can assert as many defenses as can be supported by evidence. If affirmative defenses such as self defense or alibi are presented the issues thereon are tried as part of the criminal case, and if any such defense raises in the mind of a jury a reasonable doubt as to the defendant's guilt

he should be acquitted. The defense of insanity stands upon the same footing. The fact that this issue has been separated from other questions for the purpose of trial does not make a civil case out of that which is tendered as a defense to an accusation of crime. * * * "

The Court in the *Becksted* case relied on *Martz v. People,* 114 Colo. 278, 162 P. (2d) 408; *Mundy v. People,* 105 Colo. 547, 100 P. (2d) 584; *Graham v. People,* 95 Colo. 544, 38 P. (2d) 87, and *Carter v. People,* 119 Colo. 342, 204 P. (2d) 147, all of which hold that insanity in a criminal case is an affirmative defense to which criminal law procedures are applicable.

■ *Second.* The issue whether an accused who submits to the procedures prescribed by statute in connection with criminal insanity can at the same time claim that he is being compelled to testify against himself has been previously determined adversely to the contention of the defendant. Much the same argument was tendered in *Ingles v. People,* 92 Colo. 518, 22 P. (2d) 1109, where the Court summarily disposed of the contention with this statement:

" * * * Such incarceration and examination does not offend against section 18, article 2, of the state Constitution, providing that no person shall be compelled to testify against himself in a criminal case. *Jessner v. State,* 202 Wis. 184, 231 N.W. 634."

The point was again raised in *Wymer v. People,* 114 Colo. 43, 160 P. (2d) 987, and again it was rejected, the Court there saying:

" * * * All this has heretofore been presented, argued, and refuted in this court in a case wherein we pointed out that no change in the matter of incarceration and observation had been provided by the act of 1927 save from jail to hospital, and held that act no violation of defendant's constitutional exemption from testifying against himself. We find no occasion to amplify what we there said. *Ingles v. People,* 92 Colo. 518, 524, 22 P. (2d) 1109."

It is impossible to see how the privilege against compulsory incrimination can be violated in connection with the procedure now prescribed by statute in this type of case. C.R.S. 1953, 39-8-1, Cum. Supp., enacted in 1955, provides that evidence of mental condition may be offered regardless of whether a plea of not guilty by reason of insanity has been interposed. This is but a codification of a number of decisions which have upheld this right. *Ingles v. People,* supra; *Becksted v. People,* supra, and *Leick v. People,* supra.

 Since the defendant can offer evidence of his insanity as bearing upon his ability to form criminal intent, it cannot be said that he is *compelled* to enter a plea of not guilty by reason of insanity, and hence there is no basis for holding his election to do so as compulsory incrimination. If he voluntarily elects to exercise the privileges granted by the plea he must accept the burdens as well as the benefits which flow from it. One of these burdens is that statements to psychiatrists commissioned by the court will become part of the testimony of the case.

*Third,* Counsel for defendant cross-examined various of the people's witnesses as to the mental condition of the accused at the scene of the crime. One of the officers was asked how the defendant looked and he answered that he was glassy-eyed. He was then asked whether he looked confused and he replied that he did. Another witness was asked whether he had ever seen an insane person's eyes and he was further asked whether this man's eyes had that appearance. He replied that they did. Furthermore, in the exculpatory statement given by accused to Captain Zarnow, he stated that he did not remember the actual stabbing, although he remembered the events prior thereto.

 In view of the fact that evidence was introduced as part of the people's case in chief which tended to establish the insanity of the defendant, it was not error for the trial court to receive the testimony of the

people's psychiatrists at this stage of the trial. Ordinarily the issue of insanity is not present at the outset of the trial and is not properly a part of the prosecution's case. The defendant is presumed to be sane and this presumption continues until evidence of his insanity is offered. Following the introduction of such evidence, however, the people have the burden of proving his sanity beyond a reasonable doubt. Therefore, once the presumption of sanity was rebutted by the introduction of evidence of insanity it was incumbent on the prosecution to prove the sanity of the accused as part of their case in chief and therefore it was not error to receive this evidence. See *Martz v. People,* 114 Colo. 278, 162 P. (2d) 408 and *Graham v. People,* 95 Colo. 544, 38 P. (2d) 87. Here the prosecution faced a dilemma when evidence of his insanity was introduced by the accused through cross-examination of the state's witnesses at the initial stage of the trial. If the people had rested without refuting this testimony there existed a hazard that the accused would also rest and that the undisputed evidence of insanity would prevail. This being so, there was a sound basis for the trial court's decision to receive this testimony as part of the main case.

4. *The issue whether the right and wrong and irresistible impulse tests deprive the accused of due process of law.*

Defendant's final contention is that the test of insanity prescribed by statute, C.R.S. 1953, 39-8-1 (2), is so uncertain, ambiguous and unintelligible as to constitute a deprivation of due process of law. The statute in question reads:

"(2) The applicable test of insanity in such cases shall be, and the jury shall be so instructed: 'A person who is so diseased in mind at the time of the act as to be incapable of distinguishing right from wrong with respect to that act, or being able so to distinguish, has suffered such an impairment of mind by disease as to destroy the will power and render him incapable of

choosing the right and refraining from doing the wrong, is not accountable; and this is true howsoever such insanity may be manifested, whether by irresistible impulse or otherwise. But care should be taken not to confuse such mental disease with moral obliquity, mental depravity, or passion growing out of anger, revenge, hatred or other motives, and kindred evil conditions, for when the act is induced by any of these causes the person is accountable to the law.'"

Thus our statute has adopted the so-called M'Naghten Right and Wrong Test and also the irresistible impulse test. Thus a person is held to be insane as far as the criminal laws are concerned when he is so diseased in mind as to be incapable of distinguishing right from wrong or where he suffers such an impairment of mind as to render him incapable of choosing the right and refraining from doing the wrong. Prior to the above codification in 1951 this was the test approved by our decisions. See *Ryan v. People* (1916), 60 Colo. 425, 153 P. (2d) 756. See also *Arridy v. People* (1938), 103 Colo. 29, 82 P. (2d) 757. It has since been followed and finally codified in the quoted enactment. It is now claimed that this is so at variance with scientific fact as to be impractical and so unworkable as to deprive an accused of due process and equal protection of the laws.

The position of the defendant is summarized in an editorial comment in 45 A.L.R. (2d) 1447, 1450, 1451.

" * * * It seems clear, however, in the light of current medical and psychiatric information, that the ability to 'know' right from wrong should no longer be presented to jury or witness in the exclusively intellectual sense in which that word has ordinarily been used in the application of the rule in the past, but that the test should be the accused's ability to emotionally and intellectually realize and appreciate, as an integrated personality, the nature and consequences of the moral choice presented, and that the mere ability to verbalize a correct answer to questions about the distinction should not be accepted

as conclusive on the issue of criminal responsibility. And, by the same token, the tendency of some of the courts to hold opinion testimony on the question to the narrow issue of strictly intelectual capacity should be corrected, and experts should be permitted to make freely available to court and jury the benefits of their technical information upon the issue. * * * "

The same author, however, concedes that the view which he advocates is at variance with the fundamental moral approach of our law. On this he declares:

"So long as the law continues its present focus upon the question of moral guilt, it seems that a test of criminal responsibility must continue to be the capacity to form a criminal intent, and the phraseology of 'right and wrong' embodied in the M'Naghten rules seems to be as effective a means of formulating this test as is available."

Counsel relies upon the decision of the Court of Appeals for the District of Columbia in *Durham v. United States*, 294 App. D.C. 228, 214 F. (2d) 862, 45 A.L.R. (2d) 1430, and the extensive note in 45 A.L.R. (2d) 1441. The *Durham* rule is a repudiation of the right and wrong test of criminal insanity. It is a holding that the right and wrong test and irresistible impulse tests failed to supply adequate criteria for determining a criminal responsibility. It is also a judicial adoption of the test of mental disease or mental defect.

It would appear that the State of New Hampshire has also repudiated the right and wrong and irresistible impulse test. *State v. Jones*, 50 N.H. 369. Other than New Hampshire and the District of Columbia, it would seem that either the right and wrong test or that test together with the irresistible impulse test are recognized and followed in virtually every state in the union as well as in England. Arguments such as those presented and criticisms of the kind that appear in the *Durham* case and in the note thereto are not, however, persuasive in the present controversy. None of these authorities go so far

as counsel here contends. They do not hold that the psychiatrists' approach to criminal insanity is part and parcel of due process of law. The kind and character of test and the extent of the category of recognized criminal irresponsibility are questions of policy which are properly within the province of the Legislature. This principle was well expressed in *Leland v. Oregon,* 343 U.S. 790 at pp. 800, 801 as follows:

" * * * Knowledge of right and wrong is the exclusive test of criminal responsibility in a majority of American jurisdictions. The science of psychiatry has made tremendous strides since that test was laid down in *M'Naghten's Case,* but the progress of science has not reached a point where its learning would compel us to require the states to eliminate the right and wrong test from their criminal law. Moreover, choice of a test of legal sanity involves not only scientific knowledge but questions of basic policy as to the extent to which that knowledge should determine criminal responsibility. This whole problem has evoked wide disagreement among those who have studied it. In these circumstances it is clear that adoption of the irresistible impulse test is not 'implicit in the concept of ordered liberty.' * * * "

Thus the arguments in the case at bar fall short of the mark. We hold that the test of criminal irresponsibility is for the General Assembly to determine and to change, if indeed it is to be changed. The instant question is not one of constitutional law, state or federal, and we hold the statute to be a valid exercise of legislative power.

We perceive no error in the record and the judgment should therefore be affirmed and it is so ordered.

MR. JUSTICE FRANTZ not participating.