The PEOPLE of the State of Colorado, Plaintiff–Appellee,

v.

Dale Sample GRANT, Defendant–Appellant.

No. 03CA1034.

Colorado Court of Appeals, Div. V.

Jan. 25, 2007.

Rehearing Denied April 12, 2007.

---

* Sitting by assignment of the Chief Justice under provisions of Colo. Const. art. VI, § 5(3), and

§ 24–51–1105, C.R.S.2006.

 

John W. Suthers, Attorney General, Paul Koehler, Assistant Attorney General, Denver, Colorado, for Plaintiff–Appellee.

Douglas K. Wilson, Colorado State Public Defender, Mark G. Walta, Deputy State Pub-

lic Defender, Denver, Colorado, for Defendant–Appellant.

Opinion by Judge DAILEY.

Defendant, Dale Sample Grant, appeals the judgments of conviction entered upon jury verdicts finding him guilty of first degree murder, attempted first degree murder, first degree assault, second degree assault, and resisting arrest. He also appeals the sentences imposed. We affirm.

The charges in this case arose out of an incident in which the eighteen-year-old defendant attacked three others with a hunting knife.

For a month prior to the incident, defendant had been living in an apartment with a friend and his friend's mother. He smoked marijuana on a daily basis and began experimenting with lysergic acid diethylamide (LSD). During that period, defendant had a bad experience with LSD, which resulted in his becoming very scared and claiming that "the devil was after [him]." Thereafter, he acted abnormally and complained on numerous occasions about "seeing the devil and reflections and other stuff."

On the day in question, defendant told his friend that he had not slept well the night before because "[Satan was] messing with [his] head," and he told his employer that he "was seeing the devil." Before coming back to the apartment that evening, he smoked a substantial amount of marijuana, some of which he later claimed was laced with methamphetamine. Defendant later also admitted that he had used LSD on either the night, or a few days, before the incident.

In the apartment that evening were defendant, the friend, the friend's mother, and a fifteen-year-old neighbor girl. Defendant picked up a hunting knife from a dresser after claiming to have heard something. When his friend indicated he had not heard anything, defendant threatened to kill him. When the friend sought to have his mother intervene, defendant rushed up from behind, saying, "[T]he devil is on [the friend]. I've got to get the devil off him." Although the mother initially talked defendant into giving up the knife, defendant changed his mind,

struggled with the mother, somehow regained possession of the knife, and stabbed her in the shoulder. The friend tried to intervene, and his hand was cut while scuffling with defendant.

The friend and the mother escaped, leaving only defendant and the neighbor girl in the apartment. The neighbor girl was overheard saying, "Dale, it's me, your neighbor, it's okay." Thereafter, loud noises and screams were heard coming from the apartment. When the police arrived, they found defendant standing inside the apartment, covered in blood, mumbling and yelling incoherently. The neighbor was lying nearby: she had been stabbed and slashed eighteen times, and she subsequently died from excessive loss of blood.

Following the incident, defendant told law enforcement authorities that he knew he was stabbing bodies and that he repeatedly, intentionally stabbed the neighbor. According to him, the neighbor was changing into a devil or a dragon, of which he was afraid. Psychiatrists who talked to him described him as believing that the neighbor was "under the influence of," "infested by," "inhabited by," or "turning into" the devil or a dragon.

At trial, defense and prosecution psychiatrists alike opined that defendant was psychotic at the time of the incident. Defendant's psychiatrists attributed his psychosis to schizophrenia that either predated or was unrelated to his use of drugs; thus, they posited that he was legally insane during the incident. The prosecution's psychiatrists, however, attributed defendant's psychosis to his use of LSD, marijuana, and amphetamines; thus, they posited that he was legally sane at the time.

Defendant asserted that, even if he were legally sane, his mental condition was such that he lacked the requisite culpable mental state for the more serious charges.

The jury found defendant guilty as charged, and the trial court sentenced him to (1) life imprisonment without possibility of parole for first degree murder of the neighbor; (2) twenty years imprisonment for attempted first degree murder and ten years

imprisonment for first degree assault on the mother; (3) eight years imprisonment for second degree assault on the friend; and (4) twelve months imprisonment for resisting arrest. The court ordered that the sentences be served consecutively, except those for attempted murder and first degree assault, which were to be served concurrently with one another.

## I. Suppression of Statements

■ Defendant contends that reversal is required because the trial court did not suppress statements that law enforcement authorities obtained from him in violation of *Miranda v. Arizona,* 384 U.S. 436, 444, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694 (1966). We disagree.

Under *Miranda v. Arizona, supra,* 384 U.S. at 478–79, 86 S.Ct. at 1630, the prosecution may not use in its case-in-chief a statement obtained by police during custodial interrogation unless the suspect was advised of and validly waived certain Fifth Amendment rights. *See People v. Wood,* 135 P.3d 744, 749 (Colo.2006).

Here, the statements defendant challenges were not introduced by the prosecution as part of its case-in-chief. Rather, defendant introduced these statements as part of his case-in-chief to show his mental state at or around the time of the incident. For this reason, defendant cannot now claim that his statements (or those unfavorable portions thereof upon which the prosecution relied in rebuttal) were admitted in violation of *Miranda. See People v. Wood, supra,* 135 P.3d at 749 (*Miranda* prohibits use of statements in prosecution's case-in-chief); *People v. Stewart,* 55 P.3d 107, 119 (Colo.2002)(under invited error doctrine, a party is precluded from urging on appeal error based on matters that he or she strategically injected into the case); *People v. Melillo,* 25 P.3d 769, 775 (Colo.2001) (ordinarily, under the rule of completeness, if part of a defendant's statement is introduced by one party as an admission or declaration, the other party may have the remainder of the statement admitted as well).

■ We note that in his reply brief defendant asserts that, in addition to being obtained in violation of *Miranda,* his statements were involuntary. Because this argument is raised for the first time in his reply brief, we decline to consider it. *See People v. Czemerynski,* 786 P.2d 1100, 1107 (Colo. 1990); *People v. Harrison,* 58 P.3d 1103, 1108 (Colo.App.2002).

## II. Additional Psychiatric Evaluation

■ Defendant next contends that the trial court erred by ordering him to submit to an additional examination on the issue of sanity. We disagree.

When a defendant enters a plea of not guilty by reason of insanity, the trial court must order him committed for a sanity examination by one or more doctors specializing in nervous and mental diseases. Sections 16–8–105.5(1), 16–8–106(1), C.R.S.2006. "For good cause shown, upon motion of the prosecution or defendant, or upon the court's own motion, the court may order such further or other examination, including services of psychologists, as is advisable under the circumstances." Section 16–8–106(1).

■ "Although the [good cause] standard is not an onerous one, there must be some basis, other than counsel's opinion, for showing that the first examination was inadequate or unfair." *People v. Garcia,* 87 P.3d 159, 163 (Colo.App.2003), *aff'd in part and rev'd in part on other grounds,* 113 P.3d 775 (Colo. 2005). The determination of whether good cause has been shown is a matter committed to the discretion of the trial court. *People v. Galimanis,* 765 P.2d 644, 646 (Colo.App. 1988).

Here, a little more than a month before trial, the prosecution moved for an order requiring defendant to submit to a further mental examination. The prosecution asserted that, although the parties had long been aware of defendant's drug use, none of the examining experts had, until recently, considered whether defendant's hallucinations could have been caused by his use of LSD even though it was not detected in his blood following the incident. This possibility, the prosecution asserted, had been raised only

after the doctor who conducted the most recent examination, for which there had been no objection, recommended further examination by an expert in a condition known as hallucinogen persisting perception disorder.

Defendant objected to any further examination based on the timing of the examination in relation to the scheduled trial date. He asserted that he would be prejudiced because of his inability to assess the results of the new examination and, if necessary, prepare a surrebuttal case for trial. He did not object, as he does here on appeal, on the ground that he would be prejudiced by being required to supply yet more statements that could be used to assess his mental condition.

The trial court determined that the prosecution established good cause for a further examination. Cognizant of defendant's concern about preparing for trial, however, the court set a time by which the examination was to be completed and a report submitted.

▮ A party is not entitled to have another examination by a different doctor simply because the original examination did not yield favorable results. *Cf. Massey v. Dist. Court*, 180 Colo. 359, 365, 506 P.2d 128, 131 (1973) ("A court-appointed medical expert who expresses his professional opinion in a trial is not a partisan, but is, in effect, the court's witness."). Here, however, the prosecution did not request that defendant be examined by another expert simply because the prior experts' opinions were not favorable, but rather, because the prior experts' opinions were incomplete, that is, a potentially new and significant diagnosis had been proposed that could dramatically affect an assessment of defendant's behavior on the day of the incident.

Under the circumstances, we perceive no abuse of the trial court's exercise of discretion in permitting another examination. *See People v. Diaz–Garcia*, 159 P.3d 679, 684 (Colo.App. No. 04CA2658, Aug. 24, 2006) (a court abuses its discretion only if its decision is manifestly arbitrary, unreasonable, or unfair).

### III. Mid–Trial Motion for Acquittal

▮ We are not persuaded by defendant's contention that the trial court should have granted his mid-trial motion for acquittal because the unrebutted evidence presented by the prosecution in its case-in-chief established that he was insane at the time of the crime.

Section 16–8–105(2), C.R.S.2006, provides that "[e]very person is presumed to be sane; but, once any evidence of insanity is introduced, the people have the burden of proving sanity beyond a reasonable doubt."

▮ The presumption of sanity carries no weight as evidence, but simply promotes trial efficiency by relieving the prosecution of the burden of proving the defendant's sanity until some credible evidence of insanity is admitted. *People v. Hill*, 934 P.2d 821, 824–26 (Colo.1997); *see, e.g., People v. Murphy*, 416 Mich. 453, 331 N.W.2d 152, 157 (1982)(presumption of sanity "vanishes and has no continued significance" once evidence of insanity is introduced).

▮ Once the presumption of sanity has been rebutted by the production of some evidence of a defendant's insanity, a directed verdict of acquittal must be granted to the defendant if the prosecution fails to put on evidence of his or her sanity. *People v. Kernanen*, 178 Colo. 234, 240, 497 P.2d 8, 12 (1972).

▮ The presumption of sanity may be rebutted by evidence of insanity presented during the prosecution's case-in-chief, *see Castro v. People*, 140 Colo. 493, 506, 346 P.2d 1020, 1027 (1959), and a lay witness may testify to his or her opinion concerning a defendant's mental condition. *See § 16–8–109*, C.R.S.2006; *People v. Rubanowitz*, 673 P.2d 45, 46–47 (Colo.App.1983). However, to place the affirmative defense of insanity at issue and dispel the presumption of sanity, the evidence must tend to establish each of the elements of the insanity defense. *Cf. People v. Hendrickson*, 45 P.3d 786, 791 (Colo.App.2001)(discussing affirmative defense of entrapment).

▮ Whether sufficient evidence was presented to support the affirmative defense of

insanity and dispel the presumption of sanity is a matter of law for the court to decide. *See People v. Hill, supra,* 934 P.2d at 826; *see also People v. Johnson,* 180 Colo. 177, 179, 503 P.2d 1019, 1020 (1972). "If [the] trial court determines as an issue of law, that no evidence exists in the record to support an affirmative defense, there is no issue of fact for the jury to resolve," *People v. Hill, supra,* 934 P.2d at 826, much less evidence to support a directed verdict of acquittal.

Under § 16–8–101.5(1)(a) and (b), C.R.S. 2006, a person is insane when he or she (1) is "so diseased or defective in mind at the time of the commission of the act as to be incapable of distinguishing right from wrong with respect to that act" or (2) "suffered from a condition of mind caused by mental disease or defect that prevented the person from forming a culpable mental state that is an essential element of a crime charged."

Here, defendant asserts that evidence presented during the prosecution's case-in-chief was sufficient to rebut the presumption of sanity and to require the prosecution, at that time, to prove his sanity beyond a reasonable doubt.

Significantly, the evidentiary posture of the case was much different at the end of trial than it was at the end of the prosecution's case-in-chief. Indeed, the prosecution's case-in-chief consisted of the following evidence: (1) evidence of defendant's drug use, and of the commencement of his bizarre and hallucinogenic behavior after he started ingesting LSD; (2) the testimony of the two surviving victims and the arresting police officer, as to defendant's bizarre statements and behavior before and during the incident and his incoherent mumbling and seeming incomprehension of police commands at the scene; (3) the testimony of a neighbor who heard the screams coming from the apartment; (4) evidence that the deceased victim was fifteen years old; (5) crime scene evidence; and (6) evidence of the wounds inflicted on the victims and the cause of death for the deceased victim.

At this point, only defendant's statements made before and during the attack itself had been admitted into evidence; none of the statements that he thereafter made to a par-amedic, to law enforcement authorities, or to mental health experts, had yet been admitted into evidence. Further, no expert or lay evidence had, as yet, been presented that, at the time of the incident, defendant suffered from a mental disease or defect and either did not know the difference between right and wrong or could not form the requisite culpable mental states for the crimes with which he was charged. Thus, as found by the trial court, the prosecution's evidence was not sufficient to support a finding of insanity on defendant's part. *See* § 16–8–101.5(1)(a)–(b).

Moreover, even if the prosecution's evidence were otherwise sufficient to raise an issue about defendant's sanity, according to that evidence, defendant's bizarre and hallucinogenic behavior began only after he started ingesting LSD.

A defendant may not assert that he was insane because of a mental state contracted through the voluntary use of intoxicants. *See* § 16–8–101.5(2)(b), C.R.S 2006 (excluding from insanity those "mental disease[s] or defect[s]" that are "attributable to the voluntary ingestion of alcohol or any other psychoactive substance"); *State v. Sexton,* 904 A.2d 1092, 1100 (Vt.2006)("it is universally recognized that a condition of insanity brought about by an individual's voluntary use of alcohol or drugs will not relieve the actor of criminal responsibility for his or her acts" except in cases of settled insanity); *see also Bieber v. People,* 856 P.2d 811, 817 (Colo.1993) (recognizing the stated principle in rejecting even "settled insanity"—an insanity caused by the long-term use of drugs or intoxicants—as a defense in Colorado).

Because, at that point in the case, no evidence had been presented that defendant's mental condition was unconnected to his use of drugs, the evidence was insufficient to support an insanity defense and require the prosecution to prove defendant's sanity beyond a reasonable doubt.

Consequently, we conclude that the trial court did not err in denying defendant's midtrial motion for acquittal.

*IV. Privilege Against Self–Incrimination*

On several grounds, defendant contends that he was deprived of his due process rights and, more specifically, the protections of his constitutional privilege against self-incrimination. We are not persuaded.

### A. Statements During Court–Ordered Examinations

■ Initially, he asserts that his rights were abridged when one expert (Dr. Miller) was allowed to testify to, and the prosecution to comment on, statements defendant made during court-ordered mental examinations.

In *People v. Herrera*, 87 P.3d 240, 250–51 (Colo.App.2003), a division of this court recognized that, to preserve a defendant's privilege against self-incrimination, evidence derived from court-ordered sanity examinations may be used only to determine whether the defendant had the capacity to form a requisite mental state and not to determine whether the defendant actually formed or had that mental state during the commission of the crime.

Here, neither the testimony nor the prosecution's comments in closing argument to which defendant alludes crossed the line between proper and improper use of defendant's statements. In these instances, the expert and the prosecution addressed the evidence in terms of whether defendant was able to accomplish deliberate acts or "could" intend to do things, and not whether defendant had acted deliberately and intentionally. *See People v. Herrera, supra*, 87 P.3d at 250–51 (expert's opinion that "I think he did deliberate," "I think there was a period of at least two minutes between the time he made up his mind to act and the time he actually acted and took his father's life," and "I think he intended to kill his dad," went to defendant's actual culpability and, thus, were improper).

### B. Limiting Instruction

■ Next, defendant asserts his rights were abridged because the jury was not informed that it could consider the experts' testimony only for the limited purpose of determining defendant's capacity to form the culpable mental state. However, as pointed out by another division of this court, § 16–8–107(1.5)(a), C.R.S.2006, only requires such a limiting instruction "at the request of either party." *See People v. Freeman*, 47 P.3d 700, 704 (Colo.App.2001). No limiting instruction was requested in this case.

Although defendant asserts that *People v. Herrera, supra,* suggests that a limiting instruction is constitutionally required, we find no such suggestion in *Herrera.* And, like the division in *People v. Freeman, supra,* we conclude that the trial court's failure sua sponte to provide a limiting instruction did not violate defendant's privilege against self-incrimination.

### C. Post–Arrest Silence

■ Defendant also argues that reversal is required because the prosecution improperly elicited evidence of his post-arrest silence.

In rebutting defense evidence of insanity, the prosecution elicited testimony that, during one of the court-ordered examinations, defendant refused to answer questions about his hallucinations and was careful not to divulge any information about the alleged offenses. On another occasion, while cross-examining a police detective, the prosecution elicited testimony that when, following the incident, defendant talked to the police about his hallucinations, he attempted to divert the discussion away from the incident itself.

Defendant did not object on either occasion to the receipt of this evidence. Consequently, reversal is not warranted in the absence of plain error. Crim. P. 52(b); *People v. Kruse*, 839 P.2d 1, 3 (Colo.1992).

■ Plain error is error that is "obvious," "substantial," and "grave." It is error that seriously affects the substantial rights of the accused and so undermines the fundamental fairness of the trial itself as to cast serious doubt on the reliability of the judgment of conviction. *Moore v. People*, 925 P.2d 264, 268–69 (Colo.1996).

Here, we discern no error, much less "obvious" error.

First, it appears that the testimony challenged on appeal did not, constitutionally speaking, concern defendant's "silence." *See People v. Rogers,* 68 P.3d 486, 492 (Colo.App. 2002) ("A defendant cannot have it both ways. If he talks, what he says or omits is to be judged on its merits or demerits." (quoting *United States v. Goldman,* 563 F.2d 501, 503 (1st Cir.1977))).

Further, in *People v. Tally,* 7 P.3d 172, 182 (Colo.App.1999), a division of this court recognized that "[a] defendant's sanity is not an element of the offense" and therefore "a defendant's right against self-incrimination is not implicated when testimony is admitted only for the purpose of establishing [the] defendant's sanity." Thus, the division found no violation of the privilege from the admission of evidence that the defendant refused to speak with a court-appointed psychiatrist. *See also Johnson v. People,* 172 Colo. 72, 77, 470 P.2d 37, 40 (1970) ("the fact of noncooperation may be shown" for purposes of rebutting insanity claim).

Under *Tally* and *Johnson,* we find no violation of the privilege when, in response to other related evidence elicited by the defense in support of its insanity theory, two witnesses—an expert who conducted a court-ordered mental examination and a police detective—referenced at most defendant's partial silence.

We reject defendant's additional assertion that this evidence was plainly inadmissible because it was irrelevant or unduly prejudicial under CRE 401 and 403.

Evidence is relevant if it tends to make the existence of any fact of consequence to the determination of the action more probable or less probable than it would be without the evidence. CRE 401.

■ Even relevant evidence is excludable, however, if it is "unfairly" prejudicial, that is, if it has an "undue tendency to suggest a decision on an improper basis, commonly but not necessarily an emotional one, such as sympathy, hatred, contempt, retribution, or horror." *Masters v. People,* 58 P.3d 979, 1001 (Colo.2002)(quoting *People v. Dist. Court,* 785 P.2d 141, 147 (Colo.1990)). For the evidence to be excludable, however, the

danger of unfair prejudice must substantially outweigh the legitimate probative value of the evidence. CRE 403.

■ A trial court has broad discretion to determine the relevance and relative probative value and potential unfair prejudice of evidence. *See People v. Saiz,* 32 P.3d 441, 446 (Colo.2001).

Here, the prosecution's expert related how defendant's silence factored into his assessment that defendant was not psychotic, but was only pretending to be so at the time of the examination. Moreover, this evidence was elicited only after the defense offered testimony from two of its experts as to how defendant's silence in his interviews with them factored into their assessment that he was insane.

. Likewise, the detective's testimony appears to have been relevant in determining whether defendant was in a dissociative state of mind at or near the time of the incident.

In light of these circumstances, we perceive no error, much less plain error, resulting from the admission of this evidence.

*V. Defendant's Right to Present a Defense*

■ We also find unpersuasive defendant's contention that the trial court deprived him of his due process right to present a defense by preventing him from eliciting from a qualified expert a factual opinion as to whether his mental condition defense fell within the "settled insanity" doctrine rejected in *Bieber v. People, supra.*

■ Few rights are more fundamental than the right of the accused to put before the jury evidence that might influence the determination of guilt. *People v. Richards,* 795 P.2d 1343, 1345 (Colo.App.1989). However, the right to present a defense is not absolute; it requires only that the accused be permitted to introduce all relevant and admissible evidence. *People v. Harris,* 43 P.3d 221, 227 (Colo.2002); *see Taylor v. Illinois,* 484 U.S. 400, 410, 108 S.Ct. 646, 653, 98 L.Ed.2d 798 (1988) ("The accused does not have an unfettered right to offer [evidence] that is incompetent, privileged, or otherwise

inadmissible under standard rules of evidence.").

Here, when defendant asked one of his experts what "settled insanity" was and what, if anything, the *Bieber* case on "settled insanity" had to do with this case, the prosecution objected, asserting that the question called for an opinion on a legal issue. Defendant responded that the expert wanted to distinguish *Bieber*. The court then stated:

> I think the issue is whether or not—without knowing exactly what the witness is going to say—whether or not this doctor could testify regarding a legal issue. The law generally is that witnesses cannot testify as to ... issues of law. Unless it would be helpful somehow to the court or to the jury.... I don't know what he's going to say. But it seems to me that, absent some compelling reason that you can articulate, [defense counsel], ... I will sustain the objection.

Defendant offered only that he "was trying to make a record that [the expert]—in asking [the expert] about *Bieber*—disagrees that settled insanity should not apply to this defendant and he's powerless to change what our law is."

The court responded by saying, "I won't go there. Because I don't know if he's going to say that or not."

Recently, a division of this court recognized:

> A trial court has broad discretion to determine the admissibility of expert testimony under CRE 702, and the exercise of that discretion will not be overturned on appeal absent an abuse of discretion.
>
> Expert testimony is admissible if the expert's specialized knowledge will assist the jury to understand the evidence or to determine a fact in issue. Expert testimony that is otherwise admissible is not objectionable because it embraces an ultimate issue of fact. However, an expert may not usurp the function of the court by expressing an opinion on the applicable law or legal standards.

*People v. Pahl*, 169 P.3d 169, 182 (Colo.App. No. 01 CA2020, Aug. 24, 2006) (citations omitted); *see also People v. Prendergast*, 87 P.3d 175, 182 (Colo.App.2003) ("[I]t is within the province of the trial court, and not the expert witnesses, to tell the jury what the law is.").

Here, it is unclear from defendant's offer of proof whether the expert wanted a chance to disagree with the holding in *Bieber*, or to distinguish *Bieber* from the present case, or both. Further, the grounds upon which the expert would have distinguished *Bieber* (or, for that matter, § 16–8–101.5(2)(b)) are not clear from the record or otherwise apparent to us.

In view of the very limited nature of the offer of proof made here, we can discern no abuse of the trial court's discretion in excluding the proffered testimony. *See* CRE 103(a)(2) (error may not be predicated on the exclusion of evidence unless the substance of the evidence was either apparent or made known to the court by offer of proof); *cf. People v. Lanari*, 926 P.2d 116, 121 (Colo. App.1996) (offer of proof failed to posit a relationship between the specific circumstances of the case and any elements of provoked manslaughter).

### VI. Jury Instructions

Defendant contends that the trial court provided the jury with incomplete instructions on critical issues. We conclude that reversal is not required.

### A. Voluntary Intoxication, Mental Impairment, and First Degree Murder

■ Initially, defendant asserts that the jury instructions did not adequately inform the jury of the relationship between (1) voluntary intoxication and the requisite culpable mental state for first degree murder, and (2) mental impairment short of insanity (mental impairment) and the requisite culpable mental state for first degree murder.

■ The culpable mental state for first degree murder includes both "intent" and "after deliberation." *People v. Miller*, 113 P.3d 743, 750 (Colo.2005).

■ A jury should be instructed that if it finds that "the defendant was intoxicated to

such a degree that he did not form the intent or that he did not deliberate, both of which are required elements of [the crime], the jury should find the defendant not guilty of that charge." *People v. Miller, supra,* 113 P.3d at 751.

Similarly, a jury should not find a defendant guilty of a charge when the defendant's mental impairment operated to negate the requisite culpable mental state of that crime. *See People v. Vanrees,* 125 P.3d 403, 409–10 (Colo.2005).

Defendant correctly asserts that the instructions failed to explicitly advise the jury that intoxication and mental impairment had to be considered in connection with both the "intent" and "after deliberation" components of the culpable mental state for first degree murder. On its face, the intoxication instruction addressed the "deliberation" component, while the mental impairment instruction referenced only the "intent" component.

Defendant not only failed to object to these instructions, he either tendered or requested them. Nonetheless, where, as here, it appears that an error or omission in jury instructions was due solely to attorney inadvertence, we review for plain error. *People v. Stewart, supra,* 55 P.3d at 119.

In the instructional context, the plain error standard requires a defendant to "demonstrate not only that the instruction affected a substantial right, but also that the record reveals a reasonable possibility that the error contributed to his conviction." *People v. Miller, supra,* 113 P.3d at 750 (quoting *People v. Garcia,* 28 P.3d 340, 344 (Colo.2001)).

In reviewing for plain error, we consider the instructions as a whole. *See People v. Miller, supra,* 113 P.3d at 751.

Here, we note that nowhere in the instructions was the jury informed that it was prohibited from considering evidence of voluntary intoxication on the issue of "intent" or evidence of mental impairment on the issue of "deliberation."

The intoxication instruction informed the jury that it could consider evidence of voluntary intoxication to "negate the existence of a specific intent if such intent is an element of the crime charged, such as the element of deliberation." Because, as noted in Section VII below, the jury was also informed elsewhere in the instructions that the term "after deliberation" included "intentionally," we discern no appreciable possibility that the jury misunderstood its duty to consider intoxication in connection with the "intent" as well as the "deliberation" components of first degree murder.

With respect to the mental impairment instruction, we reach a similar result, not because of other instructions but because of remarks made during closing argument. Without objection or any refutation by the prosecution, defendant remarked in closing:

[E]ven if you found that [defendant] was not insane when this happened, you must apply his mental condition to the knowingly and the intentional elements that the district attorney already talked to you about, and to after deliberation.

You were instructed that, in order to convict [defendant] of first degree murder, you would have to find that he acted after deliberation. Which means not only intentionally, but also that the decision to commit the act has been made after the exercise of reflection and judgment concerning the act. . . .

. . . What he believed that he was doing and what he was intending to do was to stab that demon. His mental state at that time did not allow him to act with deliberation.

In our view, these comments alerted the jury that it should consider mental impairment evidence in relation to the "after deliberation" component of the culpable mental state for first degree murder, and in so doing, the comments obviated any concern that the instructional error was of such a nature as to undermine our confidence in the reliability of the conviction. *Cf. People v. Goldfuss,* 98 P.3d 935, 939 (Colo.App.2004)(omission of definitional instruction not plain error where parties made contested issue clear to jury).

For these reasons, we find no plain error arising from the intoxication and mental impairment instructions.

### B. Insanity Caused by Voluntary Ingestion of Drugs

 Defendant also asserts that the trial court should have instructed the jury that an abnormal mental condition attributable to the mere voluntary ingestion (as opposed to intoxication from the use) of alcohol or any other psychoactive substance could qualify as insanity under the first, or "incapable of distinguishing right from wrong," prong of the insanity test. We disagree.

The General Assembly is vested with the authority to define criminal conduct, establish the legal components of criminal liability, and delineate statutory defenses. *See People v. McNeese*, 892 P.2d 304, 310 (Colo.1995); *see also Hendershott v. People*, 653 P.2d 385, 391 (Colo.1982)("it is within the legislature's prerogative to formulate principles of justification or excuse, usually denominated affirmative defenses, and to limit these defenses to a particular category of crimes, so long as the basic rights of the criminally accused are not thereby impaired").

Here, § 16–8–101.5 states, in pertinent part:

(1) The applicable test of insanity shall be:

(a) A person who is *so diseased or defective in mind* at the time of the commission of the act as to be incapable of distinguishing right from wrong with respect to that act is not accountable; except that care should be taken not to confuse *such mental disease or defect* with moral obliquity, mental depravity, or passion growing out of anger, revenge, hatred, or other motives and kindred evil conditions. . . . ; or

(b) A person who suffered from a condition of mind caused by *mental disease or defect* that prevented the person from forming a culpable mental state that is an essential element of a crime charged. . . .

(2) *As used in subsection (1)* of this section:

. . . .

(b) '*Mental disease or defect*' includes only those severely abnormal *mental conditions that grossly and demonstrably impair a person's perception or understanding of reality* and that are *not attributable to the voluntary ingestion of alcohol or any other psychoactive substance* . . . .

(Emphasis added.)

We conclude that the structure, context, and clear and unambiguous import of the language used in § 16–8–101.5 reveal an unmistakable intent on the part of the General Assembly to apply the exclusion for voluntary ingestion of intoxicating substances to both prongs of the insanity test. *See State v. Sexton, supra*, 904 A.2d at 1100.

Consequently, we reject defendant's assertion otherwise.

### VII. Prosecutorial Misconduct

 We are also unpersuaded that reversal is required because the prosecution remarked during closing argument that the first degree murder element of "deliberation" only requires the time necessary for "one thought to follow another. There is no time limit in the law."

 Counsel may not misstate or misinterpret the law. *People v. Anderson*, 991 P.2d 319, 321 (Colo.App.1999). We agree with defendant that the prosecution's comments referenced a legal standard that has not been in effect since 1973. *See People v. Sneed*, 183 Colo. 96, 100, 514 P.2d 776, 778 (1973); *see also Key v. People*, 715 P.2d 319, 322 (Colo.1986).

However, because defendant did not object at trial to the prosecutor's remark, we review it only for plain error. *See People v. Gordon*, 32 P.3d 575, 581 (Colo.App.2001).

 Prosecutorial misconduct in closing argument rarely constitutes plain error. *Liggett v. People*, 135 P.3d 725, 735 (Colo. 2006). To qualify as plain error, "the misconduct must be flagrantly, glaringly, or tremendously improper, and it must so undermine the fundamental fairness of the trial as to cast serious doubt on the reliability of the judgment of conviction." *Liggett v. People*,

*supra,* 135 P.3d at 735 (quoting *People v. Gordon, supra,* 32 P.3d at 581). Improper closing argument rises to this level if its probable effect is a verdict based on bias and prejudice rather than on the relevant facts and applicable law. *People v. Gordon, supra.*

Here, the instructions correctly defined the term "after deliberation" for the jury as "not only intentionally, but, also, that the decision to commit the act has been made after the exercise of reflection and judgment concerning the act. An act committed after deliberation is never one which has been committed in a hasty or impulsive manner." *See* § 18–3–101(3), C.R.S.2006.

Further, the prosecutor made only one brief reference in argument to the improper definition of "after deliberation." Under the circumstances, we conclude that the prosecutor's improper remark did not materially contribute to defendant's conviction and, thus, did not result in plain error. *See People v. Cevallos–Acosta,* 140 P.3d 116, 123 (Colo.App.2005) (prosecutor's references to improper definition of "after deliberation" during jury voir dire and closing argument not plain error); *People v. Caldwell,* 43 P.3d 663, 672 (Colo.App.2001) (prosecution's isolated misstatement concerning "after deliberation" standard not plain error).

## VIII. *Sufficiency of Evidence*

■ Defendant contends that the prosecution failed to present sufficient evidence to sustain his conviction for first degree murder and first degree assault. We disagree.

Section 18–3–102(1)(a), C.R.S.2006, provides, "A person commits the crime of murder in the first degree if . . . [a]fter deliberation and with the intent to cause the death of a person other than himself, he causes the death of that person." In § 18–3–101(2), C.R.S.2006, a "person" is defined, "when referring to a victim of a homicide," as "a human being who had been born and was alive at the time of the homicidal act."

Section 18–3–202(1)(a), C.R.S.2006, also requires, for the crime of first degree assault, that the defendant have the "intent to cause serious bodily injury to another person . . . by means of a deadly weapon."

"A person acts 'intentionally' or 'with intent' when his conscious objective is to cause the specific result proscribed by the statute defining the offense." Section 18–1–501(5), C.R.S.2006.

Here, defendant asserts that, inasmuch as the proof at trial demonstrated that he thought he was killing or assaulting something other than a human being, he could not have had the requisite intent to kill or assault "another person."

Initially, we reject the People's assertion that defendant's argument is merely an attempt to circumvent the effect of the supreme court's holding in *Bieber v. People, supra,* or § 16–8–101.5(2)(b), namely, that madness voluntarily contracted through the use of intoxicating substances does not qualify as insanity excusing a person from all criminal responsibility.

■ We arrive at this conclusion because insanity and culpable mental state issues address different concerns: "If a defendant is found to have been sane at the time of the offense, the prosecution must still prove, beyond a reasonable doubt, any applicable *mens rea* element." *People v. Hill, supra,* 934 P.2d at 828; *see also Hendershott v. People, supra,* 653 P.2d at 394–95 (legal sanity is not a proxy for mens rea).

Thus, we agree with defendant that, if insufficient evidence existed demonstrating that he intended to kill or assault humans, his convictions for first degree murder and first degree assault would have to be vacated. *See Greider v. Duckworth,* 701 F.2d 1228, 1236 (7th Cir.1983)(Posner, J., concurring)("Thus, if [an accused] was under the delusion that he was shooting two gerbils rather than two human beings, he could not be guilty of murder.").

When examining the sufficiency of the evidence, we determine whether the evidence, viewed as a whole and in the light most favorable to the prosecution, is sufficient to support a conclusion by a reasonable person that the defendant is guilty of the crime charged beyond a reasonable doubt. *People v. Sherwood,* 5 P.3d 956, 959 (Colo.App.2000).

In undertaking this analysis, we recognize the following basic rules. (1) The jury has the authority to accept or reject expert opinions and determine the facts from the evidence. *People v. Rivera,* 56 P.3d 1155, 1164 (Colo.App.2002); *see also Quintana v. City of Westminster,* 56 P.3d 1193, 1198 (Colo.App.2002)(trier of fact may reject even uncontroverted expert testimony). (2) "A defendant's mental state may be inferred from his or her conduct and other evidence," *People v. Yascavage,* 80 P.3d 899, 902 (Colo. App.2003), *aff'd,* 101 P.3d 1090 (Colo.2004), including the circumstances surrounding the commission of the crime, *People v. Preciado–Flores,* 66 P.3d 155, 165 (Colo.App.2002). (3) If there is evidence upon which one may reasonably infer an element of the crime, the evidence is sufficient to sustain that element. *People v. Caldwell, supra,* 43 P.3d at 672. (4) The prosecution, rather than the defendant, must be given the benefit of every reasonable inference that can be drawn from the evidence. *People v. San Emerterio,* 839 P.2d 1161, 1164 (Colo.1992). And (5) where reasonable minds could differ, the evidence is sufficient to sustain a conviction. *See People v. Carlson,* 72 P.3d 411, 416 (Colo.App.2003).

Here, despite the existence of evidence indicating that defendant thought he was striking at demons, dragons, or the devil, there is also evidence indicating that he knew he was striking at human beings.

After the incident, he was cognizant of having stabbed people and of having stabbed the deceased victim. In one interview, he told law enforcement authorities that he meant to stab the deceased victim on each of six separate occasions. He acknowledged his intent to stab "Sara" on those six occasions and said nothing, in this part of his statement, about intending to stab the devil or a dragon.

Further, the psychiatrists variously described defendant's belief that he was stabbing victims who were "under the influence of," "infested by," "inhabited by," or "turning into" a devil or dragon.

From this evidence and the circumstances of the crimes, we conclude that the jury reasonably could have inferred that defendant intended (1) to kill or assault demons, knowing that he was killing or assaulting the victims; (2) to kill or assault the victims as the means of killing or assaulting the demons; or (3) to kill or assault the victims, apart from (and through rejection of) defendant's purported belief in demonic activity. Because, in our view, reasonable minds could differ about whether defendant's conscious objective was to stab or kill demons or to stab and kill humans, we conclude that the evidence is sufficient to sustain defendant's convictions for first degree murder and first degree assault. *See People v. Carlson, supra; People v. Caldwell, supra.*

## IX. Cruel and Unusual Punishment

Defendant contends that punishing an individual who, according to the prosecution's theory, could not, because of his drug use, distinguish between right and wrong at the time he committed his crimes violates the Eighth Amendment's prohibition against cruel and unusual punishment. We disagree.

Initially, we note that it is not necessarily the case that the jury found that defendant was incapable of distinguishing right from wrong. The jury could, after all, have rejected the evidence indicating that he was operating under the effects of a delusional and psychotic state of mind. Thus, the factual basis for defendant's present contention may not even exist.

In any event, defendant premises his contention on the prevailing practice throughout the country, which is to shield from criminal punishment those individuals who could not appreciate the difference between right and wrong at the time of their crimes due to "settled insanity." *See Bieber v. People, supra,* 856 P.2d at 820 (Lohr, J., dissenting).

Defendant insists that this evidence of "evolving standards of decency" compels the conclusion that punishing individuals who commit crimes while in a drug-induced state of psychosis is cruel and unusual punishment. He relies on *Atkins v. Virginia,* 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002), a case in which the United States Supreme Court held that the executions of mentally retarded criminals were cruel and unusual punishments prohibited by the Eighth Amendment.

Even if we were to adapt the methodology used in *Atkins,* a death penalty case, to the

present case, we nonetheless would not conclude that punishing a person for crimes committed in a drug-induced state of mind is cruel and unusual punishment.

Defendant's contention is premised on the belief that it is unconstitutional to criminally punish a person who, under the traditional *M'Naghten* test for determining sanity, *see M'Naghten's Case,* 8 Eng. Rpt. 718 (1843), cannot distinguish right from wrong. This premise is flawed. *See Clark v. Arizona,* 548 U.S. 735, ——, 126 S.Ct. 2709, 2719, 165 L.Ed.2d 842 (2006)("History shows no deference to [the] *M'Naghten* [insanity test] that could elevate its formula to the level of fundamental principle, so as to limit the traditional recognition of a State's capacity to define crimes and defenses."); *State v. Winn,* 121 Idaho 850, 828 P.2d 879, 883 (1992) (abolition of *M'Naghten* insanity defense does not violate due process or result in the imposition of cruel and unusual punishment); *State v. Bethel,* 275 Kan. 456, 66 P.3d 840, 851–52 (2003) (same); *State v. Cowan,* 260 Mont. 510, 861 P.2d 884, 888–89 (1993)(same); *State v. Herrera,* 993 P.2d 854, 862, 867–68 (Utah 1999)(same). *But see Finger v. State,* 117 Nev. 548, 27 P.3d 66, 84 (2001)(abolition of traditional insanity defense violated due process).

Colorado has not abolished the traditional insanity defense, but only limited it in a way that "comports with and implements society's moral perception that one who has voluntarily impaired his own faculties should be responsible for the consequences." *See Montana v. Egelhoff,* 518 U.S. 37, 50, 116 S.Ct. 2013, 2020, 135 L.Ed.2d 361 (1996) (constitution does not require consideration of self-induced intoxication to negate culpable mental state element of crime).

Thus, we conclude that punishing a person who cannot, because of his or her use of psychoactive substances, distinguish right from wrong does not abridge constitutional proscriptions on cruel and unusual punishment.

To the extent that defendant additionally argues that life imprisonment, at least, is cruel and unusual punishment for him, it must be remembered that he is being punished not for his status, but rather, for his homicidal act of first degree murder. *See*

*Powell v. Texas,* 392 U.S. 514, 532–34, 88 S.Ct. 2145, 2154–55, 20 L.Ed.2d 1254 (1968) (distinguishing between the status of being an alcoholic and the act of appearing drunk in public); *People v. Smith,* 848 P.2d 365, 372 (Colo.1993) (life sentence without possibility of parole for forty years not disproportionate to crime of first degree murder).

### X. Cumulative Error

■ Defendant contends that his convictions must be reversed because the cumulative effect of the errors deprived him of his right to a fair trial. We disagree.

■ Under the cumulative error doctrine, individual errors, though themselves harmless, may in the aggregate result in an unfair trial. *People v. Jenkins,* 83 P.3d 1122, 1130 (Colo.App.2003). Here, although several errors occurred during trial, in our view, those errors did not, singly or cumulatively, deprive defendant of a fair trial. Thus, he is not entitled to reversal on a theory of cumulative error. *See People v. Knight,* 167 P.3d 147, 157 (Colo.App. No. 03CA1526, Nov. 30, 2006).

The judgments and sentences are affirmed.

Judge HAWTHORNE and Judge FURMAN concur.