The **PEOPLE** of the State of Colorado, Plaintiff–Appellee,

v.

David **GORDON**, Defendant–Appellant.

No. 99CA0419.

Colorado Court of Appeals, Div. I.

Feb. 15, 2001.

Certiorari Denied Oct. 15, 2001.

** Sitting by assignment of the Chief Justice under provisions of the Colo. Const. art. VI, sec. 5(3), and § 24–51–1105, C.R.S.2000.

Ken Salazar, Attorney General, John D. Seidel, Assistant Attorney General, Denver, CO, for Plaintiff–Appellee.

David S. Kaplan, Colorado State Public Defender, Alan Kratz, Deputy State Public Defender, Denver, CO, for Defendant–Appellant.

Opinion by Judge DAILEY.

Defendant David Gordon appeals the judgment of conviction entered upon a jury verdict finding him guilty of first degree murder. We affirm.

In March 1998, police discovered the dead body of defendant's girlfriend lying in a bed in the house where she had lived with defendant. She had been shot four times in the head—once near the right ear and three times in and about the left eye. Two different guns had been used to shoot her, a derringer and a rifle. A blanket covered part of her body, and the blanket had a bullet hole that appeared to match up to the ear wound.

Defendant's relationship with his girlfriend had been deteriorating for some time, and there was evidence that the girlfriend had wanted to separate from defendant.

After his arrest, and without any prompting, defendant made several incriminating statements to law enforcement officials.

At trial, defendant testified that his girlfriend was depressed and using drugs. He admitted he shot her the three times in and about the eye, but only after she had shot herself near her right ear. According to defendant, he had been elsewhere in the house when he heard the gunshot, and he had no idea whether she intentionally or accidentally shot herself. He related that, in order to put her out of her misery, he shot her in the face once with a derringer he claimed was lying next to her and twice with a rifle he obtained from another room.

The coroner testified that he had never encountered a suicide where the person covered his or her head with a blanket before inflicting a head wound. He further testified that only the three shots defendant admitted taking penetrated the girlfriend's brain. He attributed her cause of death to multiple

gunshot wounds and was unable to identify which wound actually caused her death.

The trial court instructed the jury on the crimes of first degree murder, second degree murder, second degree heat of passion murder, and reckless manslaughter. The jury found defendant guilty of first degree murder.

On appeal, defendant contends that the trial court erred in: (1) refusing to instruct the jury on the lesser offense of "aiding suicide" manslaughter; (2) refusing to instruct the jury adequately on his theory of defense; (3) admitting evidence of, and allowing cross-examination about, one of his statements; and (4) condoning prosecutorial misconduct during closing argument. In addition, he argues that the cumulative impact of prosecutorial misconduct in this case warrants reversal.

We address each of defendant's contentions in turn.

## I. Lesser Offense Instruction

Defendant contends that the trial court erred in not instructing the jury on another lesser homicide offense, *i.e.*, "aiding suicide" manslaughter. We disagree.

■ A trial court is not required to give a lesser offense instruction requested by a defendant unless there is some evidence tending to establish the lesser offense and a rational basis upon which the jury may acquit the defendant of the greater offense but convict him or her of the lesser. *People v. Hennion*, 923 P.2d 256 (Colo.App.1995).

Section 18–3–104(1)(b), C.R.S.2000, provides that a person commits manslaughter if "[s]uch person intentionally . . . aids another person to commit suicide."

Here, the trial court found no evidence to support defendant's request for an instruction on "aiding suicide" manslaughter. According to the trial court, Colorado's aiding suicide statute applies only to individuals who furnish others with the means of committing suicide, and not to those who, like defendant, actively participate in causing the death of suicidal persons.

Defendant contends that § 18–3–104(1)(b) encompasses active participation in causing the death of a suicidal person. This follows, he argues, because the General Assembly did not limit or otherwise qualify the term "aids"; consequently, the plain language of the statute does not limit its scope to a passive, or indirect, type of aid or assistance.

■ The interpretation of statutes presents a question of law subject to *de novo* review. *Hendricks v. People*, 10 P.3d 1231 (Colo.2000).

■ In interpreting § 18–3–104(1)(b), our task is to ascertain and give effect to the intent of the General Assembly. *People v. Swain*, 959 P.2d 426 (Colo.1998). To discern legislative intent, we look first to the plain language of the statute itself. *People v. McNeese*, 892 P.2d 304 (Colo.1995). We read its words in context and give them effect according to either their commonly accepted meaning or whatever technical or particular meaning they may have acquired by legislative definition or otherwise. *State v. Nieto*, 993 P.2d 493 (Colo.2000). When the statutory language is clear and unambiguous, the statute must be interpreted as written without resort to interpretive rules and statutory construction. *People v. Zapotocky*, 869 P.2d 1234 (Colo.1994).

Here, the critical statutory term is "aids." The General Assembly has elsewhere defined the term "to aid" in a manner adverse to defendant's position. *See* § 18–1–901(3)(a), C.R.S.2000 (" 'To aid' or 'to assist' includes . . . to make possible or available, or to further the activity thus aided or assisted."). However, as defendant points out, that definition is not necessarily exclusive of other meanings. *See Freedom Newspapers, Inc. v. Tollefson*, 961 P.2d 1150, 1154 (Colo.App. 1998)("The word 'includes' is generally used as a term of extension or enlargement when used in a statutory definition.").

■ Defendant's argument, however, ignores the context in which the term "aids" appears in § 18–3–104(1)(b). The statute reads "aids another *to* commit suicide" (emphasis added). This particular phraseology evidences a clear and unambiguous intent to penalize only persons who provide indirect

types of aid or assistance to others who then go forward and kill themselves. *See People v. Kevorkian,* 447 Mich. 436, 527 N.W.2d 714 (1994) (fn. 71) ("Suicide is, by definition, the killing of oneself," and there is "a distinction between killing oneself and being killed by another."). Indeed, as noted by the New Mexico Court of Appeals, "It is well accepted that 'aiding,' in the context of determining whether one is criminally liable for their involvement in the suicide of another, is intended to mean providing the means to commit suicide, not actively performing the act which results in death." *State v. Sexson,* 117 N.M. 113, 116, 869 P.2d 301, 304 (N.M.Ct. App.1994). We agree with this analysis and consequently conclude that under the circumstances of this case, defendant's reliance on *People v. Romero,* 745 P.2d 1003 (Colo.1987)(construing complicity statute), is misplaced.

Other jurisdictions, interpreting similarly worded statutes, have reached the same conclusion. *See People v. Cleaves,* 229 Cal. App.3d 367, 375, 280 Cal.Rptr. 146, 150 (1991)("deliberately aids, or advises, or encourages another to commit suicide" statutory language); *Goodin v. State,* 726 S.W.2d 956, 958 (Tex.App.1987)("aids or attempts to aid the other to commit or attempt to commit suicide" statutory language), *aff'd en banc,* 750 S.W.2d 789 (Tex.Crim.App.1988). *See also Model Penal Code* § 210.5(2) (1985)(proposing criminal penalties for "[a] person who purposely aids … another to commit suicide."); *Model Penal Code & Commentaries,* § 210.5 cmt. 7 at 106 (1980)(noting that the provision applies "only when the actor goes no further than aid or solicitation; if he is himself the agent of death, the crime is murder notwithstanding the consent or even the solicitation of the deceased.").

Interpreting our statute accordingly serves important public policies: it guards against murders being disguised as suicides *and* ensures that suicidal persons have the maximum amount of opportunity to choose life instead of death. *See* Note, *A Little Help From My Friends: The Legal Status of Assisted Suicide,* 25 Creighton L.Rev. 1151 (1991–92).

■ Here, there was no evidence from which the jury could find that defendant merely furnished the victim the means to kill herself; by his own account, he actively engaged those means to kill her himself. To the extent that his acts caused her death, he would, under Colorado law, be guilty of some form of homicide other than aiding suicide; and, to the extent that his acts did not cause her death, he would be guilty of no homicide at all.

Consequently, we agree with the trial court and conclude that, because there was no evidence to support a conviction of aiding suicide manslaughter, no instruction on that offense was warranted.

## II. Theory of Defense Instruction

Defendant next contends that the trial court erred in not adequately instructing the jury on his theory of the case. We disagree.

The trial court instructed the jury, at defendant's request, that there was evidence that defendant never intended deliberately to cause the victim's death and that he merely "reacted in an impulsive manner under the irresistible passion of seeing [the victim] convulsing and suffering, and shot [her] not knowing that she may have been dead."

The trial court refused defendant's request to also instruct the jury that:

In addition to the element of deliberation, the prosecution has the burden of proving causation, as well as all other elements of the crime charged, to your satisfaction beyond a reasonable doubt. If you, the jury, are not satisfied beyond a reasonable doubt that the defendant fired the shot which caused [the victim's] death, you must find him Not Guilty of the charge of Murder in the First Degree and all of its lesser included offenses.

The trial court found that these matters were adequately covered by other instructions.

■■ A defendant is entitled to an accurate instruction on his or her theory of the case if any evidence, no matter how improbable, supports the theory. *People v. Cole,* 926 P.2d 164 (Colo.App.1996). However, a trial court may refuse to give a proffered theory

of defense instruction if its content is already encompassed in other instructions. *People v. Cardenas,* 25 P.3d 1258 (Colo.App.2000).

■ Here, the elements instructions explicitly listed causation as an element of each crime. And, the generic burden of proof instruction, as well as the elements instructions themselves, explicitly informed the jury both that: (1) the prosecution had the burden of proving each and every element of a crime beyond a reasonable doubt; and (2) if the jury found that the prosecution failed to prove any one or more of the elements beyond a reasonable doubt, it should find defendant not guilty.

Given these instructions, the trial court's refusal to focus burden of proof consequences upon one particular element of the crime was not error. *See People v. Inman,* 950 P.2d 640 (Colo.App.1997); *People v. Cole, supra.*

■ Similarly, the trial court did not err in refusing to phrase the issue of causation in terms of whether defendant "fired the shot which caused [the victim's] death." The coroner could not with any certainty tell which wound caused the victim's death, testifying only that the victim died as a result of multiple gunshots to the head. Rather than allowing the jury to determine whether his shots caused the victim's death, defendant's proffered language would have effectively required the jury to return not guilty verdicts.

Defendant neither tendered to the trial court further instructions nor asked the court for assistance in drafting an accurate instruction. *See People v. Cardenas, supra.* In our view, the court's instructions defining the term "cause" and otherwise referring to defendant's "not knowing that [the victim] may have been dead," sufficed to place defendant's causation theory before the jury for its consideration.

### III. Defendant's Statement

Defendant contends that the trial court erred in allowing testimony, and cross-examination of himself, about a particular statement he made. We disagree.

After his arrest, defendant was immediately taken to the town hall, where he was advised of and asserted his rights to remain silent and to speak with an attorney. Within ten minutes of his assertion of rights, defendant asked to use the restroom. While there, he remarked to the deputy accompanying him, without any prompting by the deputy, that "I'd really like to talk to you, but I think I'd be cutting my own throat. I've got a lot of things to get off my chest but I think I need to talk to an attorney...."

The deputy testified at trial only to the first sentence quoted above, and, on cross-examination by the prosecutor, defendant was asked what he meant when he told the deputy "I've got a lot to get off my chest but I'd be cutting my own throat." Defendant answered, "Probably only that it would be foolish of me to talk to the police very much without first talking to an attorney," because defendant knew he had committed a crime "of sorts."

Defendant now contends that, by eliciting this evidence, the prosecutor impermissibly commented upon the exercise of defendant's Fifth Amendment right to counsel.

■ Pursuant to *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), a suspect, when confronted with the prospect of custodial interrogation, has Fifth Amendment rights to remain silent and to confer with counsel.

■ If the suspect invokes those rights, the state ordinarily cannot use the suspect's invocation of those rights against him or her at trial. *See Doyle v. Ohio,* 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976)(such use is fundamentally unfair, given the assurance, implicit in the *Miranda* warnings themselves, that the suspect's silence will not be penalized); *Wainwright v. Greenfield,* 474 U.S. 284, 106 S.Ct. 634, 88 L.Ed.2d 623 (1986)(silence, within the meaning of *Doyle,* encompasses request for assistance of attorney). Also, if the suspect invokes the right to counsel, the police may not thereafter question the suspect in any respect until either an attorney is present or the suspect initiates further communications with the police. *Edwards v. Arizona,* 451

U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981).

▮▮▮▮ Not every reference to an attorney invokes the right to counsel. *See People v. Romero*, 953 P.2d 550 (Colo.1998). And, volunteered statements are not barred by the Fifth Amendment. *See People v. Rivas*, 13 P.3d 315 (Colo.2000).

▮▮▮ Here, there was no impermissible use by the prosecution of defendant's invocation of the right to counsel. Defendant was not invoking his Fifth Amendment right to counsel when he spoke in the restroom with the deputy. This right involves "the assistance of an attorney *in dealing with custodial interrogation by the police.*" *McNeil v. Wisconsin*, 501 U.S. 171, 178, 111 S.Ct. 2204, 2209, 115 L.Ed.2d 158, 169 (1991). Defendant was not in any danger of being interrogated in the restroom, for he had already invoked his rights to silence and counsel, and the police had broken off any attempt to interrogate him.

In the restroom, then, defendant was not requesting the assistance of an attorney: he was initiating contact with the deputy and spontaneously uttering a potentially incriminating statement.

Defendant argues that the statement cannot be admitted because it explained why he had previously needed to invoke his right to counsel. If defendant's position were accepted, suspects, after having asserted their rights, could, at any time thereafter, volunteer whatever incriminating statements they wished, in whatever detail they wished, and then insulate themselves from the use of the statements simply by adding that that was why they had previously asserted their rights. Such a result is neither required, nor, we think, contemplated, by *Miranda v. Arizona, supra,* or its progeny.

For the same reason, the prosecutor's cross-examination of defendant was not improper. Defendant had not remained silent in the restroom, but had spontaneously made an incriminating statement indicative of his consciousness of guilt. The prosecutor simply asked defendant what he meant, and this open-ended question did not become improper because defendant chose to answer it by making reference to an attorney.

### IV. Prosecutorial Misconduct in Closing Argument

Defendant contends that prosecutorial misconduct during closing and rebuttal argument requires reversal. We do not agree.

Because defendant did not object at trial to any of the prosecutor's remarks, we review them only for plain error. *See People v. Foster*, 971 P.2d 1082 (Colo.App.1998).

▮▮▮▮ Prosecutorial misconduct in closing argument rarely constitutes plain error. *People v. Avila*, 944 P.2d 673 (Colo.App. 1997). In order to qualify as such, the misconduct must be flagrantly, glaringly, or tremendously improper, *People v. Avila, supra,* and it must so undermine the fundamental fairness of the trial as to cast serious doubt on the reliability of the judgment of conviction. *People v. Eckert*, 919 P.2d 962 (Colo. App.1996). Improper closing argument rises to this level if its probable effect is a verdict based on bias and prejudice rather than on the relevant facts and applicable law. *People v. Mandez*, 997 P.2d 1254 (Colo.App.1999).

▮▮▮ Here, while some of the prosecutor's remarks were inappropriate, they were not flagrantly or glaringly improper. *See People v. Collie*, 995 P.2d 765 (Colo.App.1999). Nor, viewed either individually or cumulatively, were they of such a nature as to seriously undermine the reliability of defendant's judgment of conviction. Consequently, plain error was not occasioned. *See, e.g., People v. Kenny*, 30 P.3d 734 (Colo.App.2000); *People v. Marion*, 941 P.2d 287 (Colo.App.1996).

### V. Cumulative Prosecutorial Misconduct

Because we have already rejected defendant's argument that the prosecutor improperly elicited evidence in violation of his Fifth Amendment right to an attorney, we also reject defendant's claim that the cumulative effect of misconduct there and in closing argument requires reversal. *See People v. Rivers*, 727 P.2d 394, 401 (Colo.App. 1986)("The doctrine of cumulative error re-

quires that numerous errors be committed, not merely alleged.").

Accordingly, the judgment of conviction is affirmed.

Judge METZGER and Judge VOGT concur.