The summaries of the Colorado Court of Appeals published opinions constitute no part of the opinion of the division but have been prepared by the division for the convenience of the reader. The summaries may not be cited or relied upon as they are not the official language of the division. Any discrepancy between the language in the summary and in the opinion should be resolved in favor of the language in the opinion.

SUMMARY
April 21, 2022

## 2022COA44

**No. 19CA2398, *People v. Bagwell* — Crimes — Murder in the First Degree; Criminal Law — Affirmative Defenses — Consent; Public Health and Environment — End-of-life Options — Colorado End-of-life Options Act**

A division of the court of appeals considers whether a defendant who intentionally kills a consenting, terminally ill victim may assert a defense of consent under section 18-1-505, C.R.S. 2021. This statute creates an affirmative defense under certain circumstances in which the victim consents to the defendant's conduct or to the injury the defendant causes. Section 18-1-505(2), however, states: "When conduct is charged to constitute an offense because it causes or threatens bodily injury, consent to that conduct or to the infliction of that injury is a defense only if the bodily injury consented to or threatened by the conduct consented to is not serious . . . ."

The division concludes that death is necessarily a bodily injury that is serious. The division therefore holds that the defense of consent is not available to a defendant who intentionally kills a terminally ill victim who consents to her own death.

COLORADO COURT OF APPEALS                                    **2022COA44**

Court of Appeals No. 19CA2398
Jefferson County District Court No. 19CR490
Honorable Lily W. Oeffler, Judge

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Bruce E. Bagwell,

Defendant-Appellant.

JUDGMENT AFFIRMED

Division II
Opinion by JUDGE KUHN
Pawar and Rothenberg*, JJ., concur

Announced April 21, 2022

Philip J. Weiser, Attorney General, Elizabeth Rohrbough, Senior Assistant
Attorney General, Denver, Colorado, for Plaintiff-Appellee

Megan A. Ring, Colorado State Public Defender, Katherine Brien, Deputy State
Public Defender, Denver, Colorado, for Defendant-Appellant

*Sitting by assignment of the Chief Justice under provisions of Colo. Const. art.
VI, § 5(3), and § 24-51-1105, C.R.S. 2021.

¶ 1     Defendant, Bruce E. Bagwell, appeals his conviction of intentional first degree murder. We affirm.

## I. Background

¶ 2     Bagwell was convicted for killing his terminally ill wife of thirty-six years. Shortly after Bagwell's wife was diagnosed with metastatic lung cancer, her health and quality of life began to deteriorate. Weeks before Bagwell fatally shot her, his wife experienced declining cognitive function, lapses in consciousness, and difficulty walking because the cancer had spread to her brain. She lost approximately forty pounds and needed a walker or wheelchair to move around their apartment. Her doctor estimated she had mere months or weeks to live.

¶ 3     Hospice care was ordered; a hospice nurse began weekly visits to the Bagwells' apartment to attend to Bagwell's wife and bring her medication for pain management. Bagwell's wife, though, elected not to take these medications or undergo the painful cancer treatments that might have prolonged her life.

¶ 4     After she allegedly asked Bagwell to end her life each day for five days straight, he shot her in the apartment they shared — twice in her head and once in her chest.

¶ 5    Shortly before Bagwell fatally shot his wife, he told her sister he believed his wife would be dead in approximately two weeks. In the hour after the shooting, Bagwell admitted to his wife's father, his wife's sister, and the arresting officers that he shot his wife because she asked him to do so to end her suffering. He told law enforcement that his wife had begged him to shoot her each of the preceding five days, and he explained that it was a "mercy killing." In a videotaped interrogation, Bagwell again admitted to two detectives that he had killed his wife.

¶ 6    Bagwell was charged with first degree murder, a class 1 felony under section 18-3-102(1)(a), (3), C.R.S. 2021. Before trial, he moved to suppress his statements to the detectives and endorsed an affirmative defense of consent under section 18-1-505, C.R.S. 2021. The trial court denied Bagwell's motion to suppress and precluded him from asserting his wife's alleged consent to be killed as a defense. The trial court reasoned that when the General Assembly intended to create an affirmative defense to homicide, it did so explicitly.

¶ 7    Bagwell was convicted and sentenced to life imprisonment. He challenges both the consent and suppression rulings on appeal.

## II.    Affirmative Defense of Consent

¶ 8    Section 18-1-505 creates an affirmative defense for criminal defendants under certain circumstances in which the victim consents to the defendant inflicting the victim's injury.  Bagwell contends the trial court erred by denying him this defense to the first degree murder charge.  We conclude that section 18-1-505 does not permit this defense when the victim consents to the defendant causing the victim's death.

### A.    The Affirmative Defense of Consent, First Degree Murder, and Standard of Review

¶ 9    Section 18-1-505 provides that consent of the victim is an affirmative defense when, as relevant here, two criteria are met. § 18-1-505(1), (2), (4).  Subsection (1) makes the defense available if "the consent negatives an element of the offense or precludes the infliction of the harm or evil sought to be prevented by the law defining the offense." § 18-1-505(1); *see Hotsenpiller v. Morris*, 2017 COA 95, ¶ 24.  But even if subsection (1) is satisfied, subsection (2) may still preclude the defense.  It provides that

> [w]hen conduct is charged to constitute an
> offense because it causes or threatens bodily
> injury, consent to that conduct or to the
> infliction of that injury is a defense only if the

> bodily injury consented to or threatened by the conduct consented to is not serious . . . .

§ 18-1-505(2).

¶ 10  We analyze whether consent can constitute a defense to a crime in the context of the particular offense and the defendant's particular conduct. *See Hotsenpiller,* ¶ 22 (citing Model Penal Code § 2.11 note 1 on General Principles (Am. L. Inst., Official Draft and Revised Comments 1985)). Bagwell committed first degree murder if, "[a]fter deliberation and with the intent to cause the death of a person other than himself, he cause[d] the death of that person." § 18-3-102(1)(a).

¶ 11  Whether section 18-1-505 permits a defense of consent to first degree murder is a question of statutory interpretation that we review de novo. *See People v. Jones,* 2020 CO 45, ¶ 54. If the defense is available, we also review de novo whether Bagwell presented sufficient evidence to be entitled to the jury's consideration of it. *People v. DeGreat,* 2018 CO 83, ¶ 16.

¶ 12  "It is the General Assembly's prerogative to define crimes and prescribe punishments . . . ." *People v. Trujillo,* 631 P.2d 146, 148 (Colo. 1981). Our primary goal in statutory interpretation is to

discern the legislature's intent and to "effectuate the purpose of the legislative scheme[,] . . . read[ing] that scheme as a whole [and] giving consistent, harmonious, and sensible effect to all of its parts." *McCoy v. People*, 2019 CO 44, ¶¶ 37-38.

¶ 13    We first look to the language of the statute, reading it as a whole and giving its words and phrases their common meanings. *Jones*, ¶ 54. If the plain meaning of the statute is clear, we apply it as written. *Id.* "If, however, the language is ambiguous, meaning it is silent or susceptible to more than one reasonable interpretation, we may use extrinsic aids of construction, 'such as the consequences of a given construction, the end to be achieved by the statute, and the statute's legislative history.'" *Id.* at ¶ 55 (quoting *McCoy*, ¶ 38).

### B.    Bagwell Was Not Entitled to An Affirmative Defense of Consent

¶ 14    Bagwell contends that section 18-1-505 permits the defense of consent to first degree murder when a terminally ill victim urges a loved one to put an end to her painful, inevitable decline. We disagree.

¶ 15 Bagwell urges that, in this situation, section 18-1-505(1) makes the defense available because the terminally ill victim's consent to dying — and the loved one's desire to fulfill that wish — "precludes the infliction of the harm or evil sought to be prevented by" the prohibition of murder. This prohibition, according to Bagwell, seeks to prevent malicious killings, not mercy killings such as the one that allegedly occurred here. In other words, Bagwell argues that the prohibition of murder seeks to prevent unwanted as opposed to wanted deaths.

¶ 16 Even if we assume, however, that subsection (1) makes the defense available to Bagwell,[1] we conclude that subsection (2) precludes it. Under any reasonable interpretation of subsection

---

[1] Historically, a victim's consent to homicide has not precluded the harm inflicted or evil sought to be prevented by its criminal prohibition, as this prohibition also serves wider societal interests beyond those asserted by the victim. Model Penal Code § 2.11 note 1 on General Principles (Am. L. Inst., Official Draft and Revised Comments 1985); *see also State v. Brown*, 364 A.2d 27, 28 (N.J. Super. Ct. Law Div. 1976) (discussing how some criminal prohibitions are designed to protect the interests of society as a whole and why the victim's consent is not considered in that context because there is more at stake than the victim's rights), *aff'd*, 381 A.2d 1231 (N.J. Super. Ct. App. Div. 1977).

(2), the injuries causing his wife's death are "bodily injur[ies] . . . [that are] . . . serious."

### 1. The Plain Meaning of Section 18-1-505(2)

¶ 17    "When conduct is charged to constitute an offense because it causes or threatens bodily injury, consent to that conduct or to the infliction of that injury is a defense only if the bodily injury consented to or threatened by the conduct consented to is not serious . . . ." § 18-1-505(2).  Whether the injuries to which Bagwell's wife consented fall under this provision turns on the General Assembly's intent in using the phrase "bodily injury . . . [that] is not serious."

¶ 18    The criminal code defines "bodily injury" as "physical pain, illness, or any impairment of physical or mental condition." § 18-1-901(1), (3)(c), C.R.S. 2021.  It does not, however, define "serious" by itself or the phrase "bodily injury . . . [that] is not serious."[2]

---

[2] The General Assembly has also defined the phrase "serious bodily injury" to mean "bodily injury which, . . . involves a substantial risk of death, a substantial risk of serious permanent disfigurement, a substantial risk of protracted loss or impairment of the function of

¶ 19    Colorado's consent defense is largely based on the Model Penal Code (MPC), *Hotsenpiller*, ¶ 22 n.5, and subsection (2) enacted section 2.11 of the MPC verbatim.  Because no Colorado appellate cases have interpreted subsection (2), we refer to the MPC and its commentary for guidance on the meaning of this portion of the consent statute.  *See Hotsenpiller*, ¶ 22 n.5.

¶ 20    The MPC explains that, for offenses that cause or threaten bodily injury, consent will have defensive significance only if, as relevant here, "*the injury is not serious.*"  Model Penal Code § 2.11 Explanatory Note (Am. L. Inst., Official Draft and Revised Comments 1985) (emphasis added).  Indeed, the commentary observes that consent is generally accepted as a defense only when "no injury is caused or the injury is slight."  *Id.* at note 2 on Bodily Injury.  Notably, the drafters of the MPC explained that homicide has universally been thought to be an offense "as to which consent

_____

any part or organ of the body, or breaks, fractures, or burns of the second or third degree." § 18-1-901(1), (3)(p), C.R.S. 2021.  The parties do not argue on appeal that the phrase "bodily injury that is serious" means the same thing as the statutorily defined term "serious bodily injury."

does not operate to prevent consummation of the crime." *Id.* at note 1 on General Principles.

¶ 21    Neither the consent statute nor the MPC defines when an injury is "serious," so we may refer to dictionary definitions to determine the plain and ordinary meaning of this term. *See People v. Serra*, 2015 COA 130, ¶ 52. The dictionary defines "serious" to include "having important or dangerous consequences." Merriam-Webster Dictionary, https://perma.cc/SXQ4-ASMV.

¶ 22    We conclude the plain meaning of section 18-1-505 reveals the General Assembly's intent to adopt the consent defense as it was described by the MPC commentary. In other words, the defense is available under subsection (2) only when the victim consents to a *minor* injury. An injury that causes a victim's death is necessarily "serious" — and thus not minor — because it involves a permanent and dangerous impairment of the victim's physical condition. The consent defense is not available, then, when a defendant intentionally kills a victim who consents to her own death.

¶ 23    Bagwell nevertheless asserts that a victim's injury is not "serious" when the victim is suffering from an agonizing, life-ending illness and urges the defendant to cause the victim's death as an

act of mercy. But the plain meaning of the phrase "bodily injury that is not serious" focuses on the degree of injury inflicted, not on the intent of the defendant, and section 18-1-505 does not suggest that a victim's injury is any less "serious" merely because the victim's pre-existing condition is dire.

¶ 24 Here, it is undisputed that Bagwell inflicted fatal gunshot wounds on his wife. Under section 18-1-505(2), such wounds are "bodily injur[ies] . . . [that are] . . . serious." Thus, even if she consented to those injuries, as Bagwell claims, the plain meaning of the statute precludes him from asserting the affirmative defense of consent to his first degree murder charge.

### 2. The General Assembly's Intent is Clear

¶ 25 Alternatively, Bagwell argues that section 18-1-505 is ambiguous and that we should apply the rule of lenity to interpret it in his favor. We are not persuaded.

¶ 26 The rule of lenity provides that, "when we cannot discern the legislature's intent, 'ambiguity in the meaning of a criminal statute must be interpreted in favor of the defendant.'" *Jones*, ¶ 70 (quoting *People v. Summers*, 208 P.3d 251, 258 (Colo. 2009)). However, we only apply this rule as a last resort — only "if after

10

utilizing the various aids of statutory construction, the General Assembly's intent remains obscured." *Summers*, 208 P.3d at 258 (quoting *People v. Thoro Prods. Co.*, 70 P.3d 1188, 1198 (Colo. 2003)); *Jones*, ¶¶ 56-71 (invoking lenity after applying multiple other tools of statutory construction). We also use the general rules of statutory construction where, as here, the statutes we interpret include citizen-initiated measures. *Huber v. Colo. Mining Ass'n*, 264 P.3d 884, 889 (Colo. 2011).

¶ 27    Even if we were to assume that the meaning of the consent statute is ambiguous, though, we would still conclude that the overall statutory scheme demonstrates that consent is not a defense to first degree murder.

¶ 28    Colorado law provides a means for terminally ill individuals like Bagwell's wife to seek the end of their own lives — the Colorado End-of-Life Options Act.[3] This Act provides a path for certain terminally ill patients to receive aid-in-dying medication from their physicians. §§ 25-48-101 to -123, C.R.S. 2021. It carefully

---

[3] Bagwell told law enforcement that he and his wife were familiar with her options under the Act but she didn't want to go to a hospital or wait to use them.

delineates which terminally ill patients are eligible for this medication, §§ 25-48-102(16), -103(1)(a), C.R.S. 2021, and the procedures necessary to receive it.[4]

¶ 29    Critically, the Act expressly states that it does not authorize any person — physician or not — to directly end an individual's life by "lethal injection, mercy killing, or euthanasia." § 25-48-121, C.R.S. 2021. To the contrary, the Act specifically notes that it does not preclude criminal penalties for conduct inconsistent with the Act. §§ 25-48-119(4), -121, C.R.S. 2021. These provisions demonstrate the Act's intent to create a narrow exception to the

------

[4] The Act requires terminally ill patients not merely to consent to receiving assistance in ending their lives, but rather to affirmatively request such assistance. § 25-48-103(1)(c), C.R.S. 2021. Even further, the patients must make the request to their attending physician specifically, § 25-48-104(1), C.R.S. 2021, and their request must be implemented via a host of statutorily prescribed procedures, *see id.* (patient must make two oral requests, separated by at least fifteen days, as well as a written request); § 25-48-103(1) (attending physician must have diagnosed patient with terminal illness and determine patient has mental capacity to request assisted suicide); § 25-48-110, C.R.S. 2021 (attending physician must verify that patient is making an informed decision); § 25-48-107, C.R.S. 2021 (consulting physician must confirm attending physician's findings); § 25-48-111, C.R.S. 2021 (attending physician must document the patient's requests and the physician's findings in patient's medical record).

prohibition of homicide by allowing individuals a path to receive assistance in ending their own lives under specific circumstances. The Act explicitly forecloses Bagwell's interpretation that the consent statute creates, in effect, its own "mercy killing" exception. Bagwell's actions directly ending another's life were not authorized by the Act or the consent statute, even under circumstances that might constitute a mercy killing.

¶ 30    The Act also left in place the offense of intentionally aiding another in committing suicide as a form of manslaughter. § 18-3-104(1)(b), C.R.S. 2021. In *People v. Gordon*, 32 P.3d 575 (Colo. App. 2001), a defendant charged with first degree murder testified that he shot and killed his suicidal girlfriend to put her out of her misery, as she had allegedly already shot herself once in the head and survived. *Id.* at 577. A division of this court concluded he was not entitled to a jury instruction on the lesser offense of manslaughter (aiding suicide). The division reasoned that the defendant did not "aid" the victim's suicide because he did not "merely furnish[] the victim the means to kill herself . . . [but rather] actively engaged those means to kill her himself." *Id.* at 578-79 ("This particular phraseology [of 'aids another to commit suicide']

13

evidences a clear and unambiguous intent to penalize only persons who provide indirect types of aid or assistance to others who then go forward and kill themselves.").

¶ 31     Likewise here, Bagwell actively engaged the means leading to his wife's death rather than indirectly aiding her passing.[5]  We conclude that if Bagwell would not even be entitled to a jury instruction on manslaughter, a lesser offense than murder, then the statutory scheme would also not entitle him to an affirmative defense completely exonerating his conduct.  *See People v. Nelson*, 2014 COA 165, ¶ 48 ("An affirmative defense admits 'the defendant's commission of the elements of the charged act, but seek[s] to justify, excuse, or mitigate the commission of the act.'" (quoting *People v. Pickering*, 276 P.3d 553, 555 (Colo. 2011))).

¶ 32     Finally, like in *Gordon*, our interpretation of the consent defense serves similar, important ends.  It guards against murders being disguised as mercy killings and gives effect to the Act's

---

[5] During his interrogation, Bagwell admitted that he and his wife had discussed helping her to commit suicide by overdose on her prescribed medications, but he alleged that they decided not to do so.

statutory safeguards surrounding a terminally ill individual's decision to seek assistance in dying. *See Gordon*, 32 P.3d at 579; § 25-48-110, C.R.S. 2021; *see also, e.g.*, § 25-48-103(1)(c) (requiring terminally ill patient to voluntarily express the wish to receive aid-in-dying medication); § 25-48-104(2)(a), C.R.S. 2021 (patient's signed, written request must be witnessed by at least two individuals); § 25-48-108, C.R.S. 2021 (requiring a physician to verify the patient is mentally capable and making an informed decision before prescribing aid-in-dying medication); § 18-1-505(3) (consent is not available as a defense if the consent is induced by force, duress, or deception, and the consenting individual must be legally competent and not unable to consent due to a behavioral or mental health disorder).

¶ 33    These considerations are particularly apt where, as here, the only evidence of Bagwell's wife's consent was from Bagwell, his wife was suffering cognitive decline, and her ability to freely and capably consent was not evaluated before her death.

¶ 34    Given this statutory context, we conclude that the General Assembly did not intend for section 18-1-505(2) to allow the defense

15

of consent to murder, and therefore, there is no basis for applying the rule of lenity.

¶ 35    In summary, we hold that a defendant is precluded from raising a consent defense under section 18-1-505 where, as here, he intentionally kills a victim who consents to her own death.  The trial court did not err by denying Bagwell's request to assert it.

### III.    Suppression of Bagwell's Statements

¶ 36    Bagwell also contends that the trial court violated his constitutional rights by denying his motion to suppress his statements to the detectives because (1) the detectives failed to obtain a valid waiver of his constitutional rights under *Miranda v. Arizona,* 384 U.S. 436 (1966); and (2) his statements were given involuntarily.  We see no error in the trial court's suppression ruling.

### A.    Additional Facts

¶ 37    One of the detectives who interrogated Bagwell testified at the suppression hearing.  A transcript and video recording capturing the entirety of the interrogation were also admitted.  The interrogation took place at the police station in a ten-by-ten-foot room and lasted approximately an hour and forty minutes.  Before

the detectives entered, Bagwell spoke spontaneously to a supervising officer for twenty minutes and admitted that he shot his wife.

¶ 38　Upon entering, the detectives read Bagwell his *Miranda* rights and asked Bagwell if he understood those rights. Bagwell responded, "Absolutely." He asked for no clarification, said no lawyer needed to be present, and then signed a written *Miranda* advisement. At no point during the rest of the interrogation did Bagwell request an attorney, ask to stop answering questions, or seek any clarification of his rights. The detectives made no promises or threats to Bagwell to get him to speak with them, and it appeared to the testifying detective that Bagwell spoke freely and voluntarily. Bagwell did most of the talking, speaking spontaneously at times and giving lengthy answers to the detectives' open-ended questions.

¶ 39　Bagwell repeatedly told the detectives that he killed his wife to end her suffering. He expressed that he was upset because he had just shot his best friend, that he hadn't wanted to kill her, and that his decision tormented him.

¶ 40    The tone of the interview was conversational.  Bagwell cooperated with the detectives' questioning and appeared to be tracking what they were saying and responding appropriately. Bagwell appeared to speak rapidly at times but said on multiple occasions that he understood he was going to be arrested for homicide, and, on one occasion, he said that he was thinking rationally.

¶ 41    The testifying detective noted that Bagwell had an odor of alcohol on his breath, but that he didn't slur his words, sway, or nod off during the interrogation.

¶ 42    Near the end of the interrogation, the detectives ordered a blood draw to test Bagwell's blood alcohol content (BAC), but neither party sought admission of the results at the hearing. Bagwell said that he believed his BAC was not high at that moment, but that he was "not completely sober" when he shot his wife.  At the end of the interrogation, Bagwell lay on the floor of the interrogation room and said he believed he was on the verge of having a partially alcohol-induced seizure.

¶ 43    In denying Bagwell's motion, the trial court found that (1) Bagwell was oriented as to time and place and that any self-

induced intoxication did not prevent him from understanding his waiver or the circumstances of the interrogation; (2) Bagwell's answers — though lengthy and spoken rapidly — were coherent and responsive to questioning, and evidenced Bagwell's understanding of his circumstances; and (3) though Bagwell appeared upset and agitated, this did not negate his ability to waive his *Miranda* rights.

## B. Standard of Review

¶ 44      We review suppression rulings as mixed questions of fact and law. *People v. Ferguson*, 227 P.3d 510, 512 (Colo. 2010) (*Miranda* waiver); *Effland v. People*, 240 P.3d 868, 878 (Colo. 2010) (voluntariness of statements). We defer to the trial court's factual findings unless they are clearly erroneous but review the court's application of the relevant constitutional law to the facts of the case de novo. *Ferguson*, 227 P.3d at 512-13.

¶ 45      In reviewing a trial court's suppression order, we look solely to the record created at the suppression hearing. *People v. Thompson*, 2021 CO 15, ¶ 16. Because we also have a video recording of Bagwell's interrogation and *Miranda* waiver, we can undertake this review independently and not just from the cold record. *See*

*Ferguson*, 227 P.3d at 514 n.3; *see also People v. Taylor*, 2018 CO 35, ¶ 7 ("Where, as here, a portion of the challenged incident is recorded, and there are no disputed facts outside of that recording pertinent to the issue of suppression, we . . . may undertake an independent review of the recording to determine whether the evidence was properly suppressed in light of the controlling law.").

¶ 46 The prosecution bears the burden of proving both the validity of a defendant's *Miranda* waiver and the voluntariness of his statements by a preponderance of the evidence. *People v. Thames*, 2015 CO 18, ¶ 12; *Effland*, 240 P.3d at 878. We consider the totality of the circumstances surrounding the interrogation. *Thames*, ¶ 13; *Effland*, 240 P.3d at 877.

¶ 47 If we conclude that the trial court erred in failing to suppress Bagwell's statements in violation of his constitutional rights, we must reverse the judgment of conviction unless the error was harmless beyond a reasonable doubt. *Hagos v. People*, 2012 CO 63, ¶ 11.

### C. Bagwell's *Miranda* Waiver Was Valid

¶ 48 Bagwell contends that the detectives failed to obtain a valid waiver of his *Miranda* rights. We disagree.

¶ 49    The United States and Colorado Constitutions guarantee individuals the right against self-incrimination.  U.S. Const. amends. V, XIV; Colo. Const. art. II, § 18.  To protect this right, *Miranda,* 384 U.S. 436, holds that the prosecution may not introduce in its case-in-chief any of a suspect's custodial statements resulting from interrogation unless the police preceded their interrogation with certain advisements of the suspect's constitutional rights.  *People v. Davis,* 2019 CO 84, ¶ 16; *Thames,* ¶ 11 ("A *Miranda* advisement is adequate as long as it conveys to the suspect a clear and understandable warning that he has a right to remain silent, anything he says can be used against him in court, he has a right to the presence of an attorney, and, if he cannot afford an attorney, one will be appointed for him prior to any questioning if he so desires.").

¶ 50    Suspects can choose to waive their rights, but this waiver is only valid if given voluntarily,[6] knowingly, and intelligently.

---

[6] Bagwell's only challenge to the voluntariness of his waiver is his contention that he was intoxicated during the interrogation.  But intoxication only renders a suspect's waiver involuntary when governmental conduct causes the intoxication, *People v. Platt,* 81

*Thames*, ¶¶ 12, 14 (listing factors for evaluating the validity of a

waiver). A suspect's waiver is knowing and intelligent "when made

with awareness of the nature of the right being abandoned and the

consequences of the decision to abandon it." *Id.* at ¶ 12. This

awareness can be diminished by a suspect's intoxication, but

intoxication does not automatically invalidate a waiver. *People v.*

*Knedler*, 2014 CO 28, ¶ 15; *People v. Platt*, 81 P.3d 1060, 1066

(Colo. 2004). We use a set of factors to determine whether a

suspect's intoxication prevented him from understanding the

nature of those rights and the ramifications of waiving them:

> (1) whether the defendant was oriented to his
> or her surroundings and situation; (2) whether
> the defendant's answers were the responsive
> product of a rational thought process;
> (3) whether the defendant was able to
> appreciate the seriousness of his or her
> situation and the possibility of incarceration;
> (4) whether the defendant had the foresight to
> attempt to deceive the police to avoid
> prosecution; (5) whether the defendant
> expressed remorse for his or her actions; and
> (6) whether the defendant expressly stated that
> he or she understood his or her rights.

---

P.3d 1060, 1066 (Colo. 2004), and the record here contains no
evidence that Bagwell's intoxication was anything but self-induced.

*Knedler*, ¶ 14 (citing *Platt*, 81 P.3d at 1066).

¶ 51     Bagwell argues that his waiver was not knowing and intelligent because he was intoxicated, sick, and visibly upset during the interrogation, and because he had no criminal history. However, the record reveals that Bagwell waived his *Miranda* rights out of a desire to justify shooting his wife — to explain she was suffering and repeatedly asked him to do it.  He was read a *Miranda* advisement, right by right, immediately before the interrogation; responded clearly that he had no questions; signed the written advisement; and said on multiple occasions that he knew he would be charged with homicide.  These circumstances establish Bagwell's awareness of his rights and the consequences of abandoning them.

¶ 52     Bagwell's self-induced intoxication did not sufficiently undermine this awareness to render his waiver invalid.  Bagwell's responses during questioning, though lengthy and at times rambling, evidence the rational thought process of an individual oriented to the circumstances of the situation.  He repeatedly said he understood the consequences of his actions, expressed remorse over them, and chose to speak with the detectives anyway.  Indeed, Bagwell waived his *Miranda* rights approximately two hours after

23

his last drink, and he told the detectives that he did not believe he was intoxicated during the interrogation.

¶ 53    Although Bagwell did exhibit some signs of disorientation, these signs do not demonstrate that his waiver was unknowing and unintelligent.  At most, they demonstrate Bagwell's understandable shock and torment over just having shot his terminally ill wife.

¶ 54    We therefore conclude the trial court did not err in ruling that Bagwell validly waived his *Miranda* rights.

### D.    Bagwell's Statements Were Made Voluntarily

¶ 55    Bagwell further contends that, even if he waived his *Miranda* rights, the trial court erred in ruling that he gave his statements voluntarily.  We again disagree.

¶ 56    The Due Process Clauses of the United States and Colorado Constitutions protect defendants from the admission of statements they made involuntarily.  *Effland*, 240 P.3d at 877.  A statement is given voluntarily if it is "the product of an essentially free and unconstrained choice by its maker."  *Id.* (quoting *People v. Raffaelli*, 647 P.2d 230, 234 (Colo. 1982)).  But a statement is given involuntarily if "coercive governmental conduct played a significant role in inducing the statement."  *Id.*  The focus of the voluntariness

24

analysis is thus "whether the behavior of the [government] official was such as to overbear the defendant's will to resist and bring about an admission or inculpatory statement not freely self-determined." *People v. Ramadon*, 2013 CO 68, ¶ 20.

¶ 57    This coercive governmental conduct can "include[] not only physical abuse or threats directed against a person, but also subtle forms of psychological coercion" like the deliberate exploitation of the suspect's weaknesses. *Effland*, 240 P.3d at 877. In assessing the coerciveness of the governmental conduct, we look at both the defendant's ability to resist coercive pressures and the nature of the police conduct, using a nonexclusive list of factors:

> (1) whether the defendant was in custody;
>
> (2) whether the defendant was free to leave;
>
> (3) whether the defendant was aware of the situation;
>
> (4) whether the police read *Miranda* rights to the defendant;
>
> (5) whether the defendant understood and waived *Miranda* rights;
>
> (6) whether the defendant had an opportunity to confer with counsel or anyone else prior to or during the interrogation;

(7) whether the statement was made during the interrogation or volunteered later;

(8) whether the police threatened [the] defendant or promised anything directly or impliedly;

(9) the method or style of the interrogation;

(10) the defendant's mental and physical condition just prior to the interrogation;

(11) the length of the interrogation;

(12) the location of the interrogation; and

(13) the physical conditions of the location where the interrogation occurred.

*Ramadon*, ¶ 20.

¶ 58     Bagwell points to no behavior by the detectives that amounted to coercive police conduct.  Indeed, he admitted his crime even before the detectives asked any questions, and throughout the interrogation he gave lengthy and revealing answers to the detectives' open-ended questions.  The detectives made no threats or promises to induce Bagwell's statements.  We do not see how Bagwell's will was overborne by the detectives' conduct.

¶ 59     We therefore conclude the trial court did not err in finding Bagwell's interrogation statements voluntary or in denying his motion to suppress.

26

## IV.    Conclusion

¶ 60    The judgment is affirmed.

JUDGE PAWAR and JUDGE ROTHENBERG concur.