23CA2089 Peo v Garcia 12-04-2025

COLORADO COURT OF APPEALS

---

Court of Appeals No. 23CA2089
Adams County District Court No. 21CR3827
Honorable Jeffrey Smith, Judge

---

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Santos Garcia Jr.,

Defendant-Appellant.

---

JUDGMENT AFFIRMED

Division II
Opinion by JUDGE BROWN
Fox and Meirink, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced December 4, 2025

---

Philip J. Weiser, Attorney General, Austin R. Johnston, Assistant Attorney
General, Denver, Colorado, for Plaintiff-Appellee

Megan A. Ring, Colorado State Public Defender, Keri Coble, Deputy State
Public Defender, Brighton, Colorado, for Defendant-Appellant

¶ 1    Defendant, Santos Garcia Jr., appeals the judgment of conviction entered on a jury verdict finding him guilty of third degree assault and obstructing a peace officer.  Garcia contends that the district court erred by (1) admitting prior acts evidence without conducting the appropriate analysis; (2) failing to require jury unanimity as to which of his acts constituted obstruction; and (3) declining to question potential jurors about race and implicit bias.  We affirm.

## I.    Background

¶ 2    In November 2021, Nayelly Mendoza was standing in her kitchen when she turned around and saw someone walking through the front door, seemingly angry and confused.  Although Mendoza did not recognize the individual, he was later identified as Garcia.  Garcia sat on the couch and indicated that he was looking for Mendoza's father, who had passed away two months earlier.  When Mendoza informed Garcia of her father's passing, Garcia began blaming Mendoza for her father's death.  Garcia also threatened her, saying that if she "called [her] brother, . . . [he] would smack the shit out of [her]."

¶ 3     Approximately twenty minutes after Garcia entered the home, Mendoza's brother, Pablo Munoz, came out of the restroom. When he saw Garcia sitting on the couch, he was surprised and did not know why Garcia was in their home. When Munoz asked why Garcia was there, Garcia responded that his sister said that Munoz "was talking shit, so [Garcia] came to [Munoz's] house." Garcia told Munoz that he wanted to fight him, so Munoz said the two should "[t]ake this outside."

¶ 4     Once outside, Garcia began scratching Munoz and attempted to bite his ear. Munoz threw Garcia to the ground. Before Garcia got up and left, he threatened Munoz, saying that he would "come back and shoot" him. Shortly after the fight ended, the police found Garcia in his sister's neighboring trailer. The officers ordered Garcia to place his hands behind his back, but Garcia resisted, tucking his hands under his body so the officers could not handcuff him. Eventually, the officers were able to free Garcia's hands and place him under arrest.

¶ 5     Based on these events, the prosecution charged Garcia with second degree burglary; first degree criminal trespass; third degree assault; obstructing a peace officer; and harassment. Following a

two-day trial, a jury convicted Garcia of the misdemeanor charges of obstructing a peace officer and harassment but acquitted him of the remaining charges. The district court sentenced Garcia to a controlling term of twelve months of probation with mandatory alcohol evaluation and treatment.

## II. Prior Acts Evidence

¶ 6 Garcia contends that the district court erred by admitting evidence of his prior uncharged misconduct without conducting the required analysis under CRE 404(b). We disagree.

## A. Additional Background

¶ 7 During opening statements, the prosecutor previewed witness testimony for the jury, explaining that minutes before Garcia entered Munoz's home, Garcia told a neighbor, "I can be anywhere I want." Defense counsel objected, arguing that the prosecutor was discussing "unlitigated 404(b)" evidence that was irrelevant.

¶ 8 Outside the presence of the jury, the prosecutor explained that the neighbor would testify that she saw Garcia in her backyard and that he was "acting drunk." When the neighbor asked why he was there, Garcia responded, "I can be anywhere I want." The neighbor called the police, who were dispatched to the neighborhood. The

prosecutor argued that he had the burden to prove Garcia's knowledge with respect to the charged trespass of Munoz's home and that Garcia's statement "demonstrate[d] his knowledge that he was going into someone's home."

¶ 9    The court overruled the objection, explaining that it was "not sure [the evidence was] 404(b)." The court said, "It doesn't strike me as a prior action. It is more on the intrinsic side and helps establish a state of mind." Defense counsel requested that the court limit the scope of the neighbor's testimony to Garcia's statement because Garcia being in the neighbor's backyard was "another crime." The court reiterated that the objection was overruled but said, "We'll limit it to just that statement."

¶ 10    The prosecutor continued his opening statement, explaining that the neighbor spotted Garcia in her backyard as she exited her trailer and walked toward her truck. Garcia positioned himself next to the truck's door. When the neighbor asked him, "What are you doing in my backyard?" Garcia responded, "I can be anywhere I want." The neighbor drove away, called the police, and met the officers nearby. Defense counsel again objected, arguing that the

prosecutor's statement went beyond the court's order, but the court overruled the objection.

¶ 11     The neighbor was the first trial witness and recalled that, after she left her trailer and saw Garcia in her backyard, she climbed into her truck, but Garcia prevented her from closing the door and "got all up in [her] face." Defense counsel repeatedly objected, arguing that the neighbor's testimony went "well beyond the scope of the [c]ourt's order." At a bench conference, the court overruled the objection but told the prosecutor to "just get to the statement." The neighbor then testified that she asked Garcia why he was in her backyard. The prosecutor inquired whether Garcia had told the neighbor that "he c[ould] be anywhere he want[ed]," and the neighbor responded, "Yes, he did." The neighbor said she called the police.

### B.     Applicable Law and Standard of Review

¶ 12     Under CRE 404(b)(1), "[e]vidence of any other crime, wrong, or act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in conformity with the character." However, such evidence may be admitted for

nonpropensity purposes, such as to show motive, intent, or knowledge.  CRE 404(b)(2).

¶ 13      To determine whether the admission of uncharged misconduct evidence implicates CRE 404(b), a trial court must first determine whether the evidence is intrinsic or extrinsic to the charged offenses.  *Rojas v. People*, 2022 CO 8, ¶ 52.  "Intrinsic acts are those (1) that directly prove the charged offense or (2) that occurred contemporaneously with the charged offense and facilitated the commission of it."  *Id.*  Because intrinsic evidence is not evidence of "other" crimes, wrongs, or acts, a court need not conduct a CRE 404(b) analysis; instead, it must "evaluate the admissibility of intrinsic evidence under [CRE] 401-403."  *Id.*  In contrast, a court may admit extrinsic evidence that implicates a defendant's bad character only as provided by CRE 404(b) and after conducting a *Spoto* analysis.  *Id.*; *People v. Spoto*, 795 P.2d 1314, 1318-19 (Colo. 1990).

¶ 14      We review a trial court's evidentiary rulings for an abuse of discretion.  *People v. Clark*, 2015 COA 44, ¶ 14.  A court abuses its discretion when its ruling is manifestly arbitrary, unreasonable, or

unfair or when it misapplies the law.  *People v. Sims*, 2019 COA 66, ¶ 44.

### C. The District Court Did Not Abuse its Discretion by Concluding the Neighbor's Testimony Was Intrinsic Evidence

¶ 15 Garcia first contends that the neighbor's testimony was extrinsic evidence that suggested bad character and that the district court should not have admitted it without conducting the appropriate analysis under CRE 404(b) and *Spoto*.  We perceive no abuse of discretion.

¶ 16 Among other crimes, Garcia was charged with second degree burglary and first degree criminal trespass.  As relevant here, a person commits second degree burglary "if the person knowingly . . . enters unlawfully in . . . a building or occupied structure with intent to commit therein a crime against another person or property." § 18-4-203(1), C.R.S. 2025.[1]  Similarly, one commits first degree criminal trespass if such person "[k]nowingly and unlawfully enters or remains in a dwelling of another."

---

[1] A prior version of section 18-4-203, C.R.S. 2025, was in effect at the time of Garcia's arrest, but the operative language cited here remains the same.  *See* Ch. 462, sec. 202, § 18-4-203, 2021 Colo. Sess. Laws 3176; Ch. 298, sec. 10, § 18-4-203, 2023 Colo. Sess. Laws 1784-85.

§ 18-4-502(1)(a), C.R.S. 2025.[2]  Critically, both charges require the prosecution to prove beyond a reasonable doubt that Garcia *knowingly* entered unlawfully into a building or dwelling.  One acts knowingly "when he is aware that his conduct is of such nature or that such circumstance exists."  § 18-1-501(6), C.R.S. 2025.

¶ 17    Proving a defendant's mental state often requires that the prosecution rely on circumstantial or indirect evidence.  *People v. Collie*, 995 P.2d 765, 773 (Colo. App. 1999).  A defendant's mental state may be inferred from his conduct or the circumstances surrounding the commission of the crime.  *People v. Grant*, 174 P.3d 798, 812 (Colo. App. 2007); *see People v. Phillips*, 219 P.3d 798, 800 (Colo. App. 2009) ("An actor's state of mind is normally not subject to direct proof and must be inferred from his or her actions and the circumstances surrounding the occurrence.").

¶ 18    The neighbor testified that Garcia walked through her backyard, and, when asked why he was there, he said he "can be anywhere he wants."  A rational juror could infer from Garcia's

---

[2] A prior version of section 18-4-502, C.R.S. 2025, was in effect at the time of Garcia's arrest, but the operative language cited here remains the same.  *See* Ch. 462, sec. 211, § 18-4-502, 2021 Colo. Sess. Laws 3178.

8

statement that he understood he was in a place he was not lawfully permitted to be in, but nonetheless felt entitled to be there, and that he maintained that knowing mental state as he unlawfully entered Munoz's home just minutes later.  The neighbor's testimony was proof of an element of the charged offenses — Garcia's mental state. *See Grant*, 174 P.3d at 812.  As a result, we perceive no error in the district court's conclusion that the neighbor's testimony was intrinsic evidence.  *See Rojas*, ¶ 52; *Vigil v. People*, 2019 CO 105, ¶ 14 ("In determining whether a trial court has abused its discretion, reviewing courts . . . must affirm as long as the trial court's decision fell within a range of reasonable options.").  And because the neighbor's testimony was intrinsic evidence, the court did not need to conduct a CRE 404(b) or *Spoto* analysis.  Instead, it was required to evaluate the testimony's admissibility under the ordinary rules of evidence.  *See Rojas*, ¶ 52.

> D.    The Neighbor's Testimony Was Admissible Under CRE 401-403

¶ 19    The Colorado Rules of Evidence favor the admissibility of relevant evidence unless otherwise prohibited by constitution, statute, or rule.  CRE 402; *Kaufman v. People*, 202 P.3d 542, 552

9

(Colo. 2009). Evidence is relevant if it has any tendency to make the existence of a fact of consequence more or less probable. CRE 401. Evidence that is not relevant is not admissible. CRE 402.

¶ 20 Evidence of Garcia's mental state was relevant because, as discussed, the charges of burglary and trespass required the prosecution to prove that Garcia knowingly entered unlawfully into Munoz's home. *See* §§ 18-4-203(1), -502(1)(a); *see also Yusem v. People*, 210 P.3d 458, 464 (Colo. 2009) (A "defendant's mental state is undeniably a material fact."). We are not persuaded otherwise by Garcia's argument that the neighbor's testimony was irrelevant because "the sole connection between the [e]vidence and the charged events [wa]s allegations of being on another's property" and that "[t]he facts [we]re otherwise dissimilar." The connection between the neighbor's testimony and the charged crime was Garcia's own statement that he could be anywhere he wanted, demonstrating his state of mind just moments before entering Munoz's home. "[E]vidence of an element of the substantive offense charged," such as the defendant's mental state, is "always relevant" because the prosecution is "required to prove that element beyond a reasonable doubt." *People v. Kembel*, 2023 CO 5, ¶ 54.

¶ 21    Still, relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." CRE 403. In deference to a trial court's admissibility decision, we assume the maximum probative value and the minimum unfair prejudice attributable to the evidence. *Yusem*, 210 P.3d at 467.

¶ 22    Garcia argues that the probative value of the testimony was minimal because his mental state "was proved more directly by other evidence." And he argues that the challenged evidence resulted in unfair prejudice because of "the broad manner [in which] the [prosecutor] framed the evidence to the jury . . . to paint Mr. Garcia as an entitled, undesirable character." But the prosecutors referenced the neighbor's testimony only once in opening statement and three discrete times in closing argument. And the prosecutors did not use the evidence to argue that Garcia was an undesirable character and should be convicted on that basis. Instead, the prosecutors' references to the evidence followed a consistent logic: (1) Garcia told the neighbor he could go

11

anywhere he wanted; and (2) Garcia, just minutes later, went anywhere he wanted. The prosecutor used the evidence for the purpose for which it was admitted — as evidence of Garcia's mental state at the time he committed the charged conduct.

¶ 23 Under these circumstances, we conclude that the district court did not abuse its discretion when it determined that the neighbor's testimony was relevant to the charged conduct and that its probative value was not substantially outweighed by the danger of unfair prejudice. *See Rojas*, ¶ 52.

## III. Unanimity Instruction

¶ 24 Garcia contends that the district court erred by failing to require juror unanimity with respect to the prosecution's charge of obstructing a peace officer. We discern no error.

## A. Additional Background

¶ 25 One of the responding officers testified that when they initially contacted Garcia, they gave him "verbal directions to stop [and] put his hands in the air." Garcia responded, "[F]uck you," and walked away, retreating inside his sister's neighboring trailer. The officers followed Garcia inside and found him sitting on the couch in the living room. The officers informed Garcia that he was under arrest

12

and ordered him to place his hands behind his back, but Garcia turned away and "tried to tuck his hands underneath his body." Eventually, the officers were able to free Garcia's hands and place him under arrest. After the officers placed him in the patrol car, Garcia "was yelling and screaming" and "began headbutting" the windows of the vehicle.

¶ 26 After the prosecution rested, defense counsel moved for a judgment of acquittal under Crim. P. 29(a). In arguing the motion, counsel identified a "potential lack of unanimity issue" as to the charge of obstructing a peace officer. Specifically, counsel argued that the "officers described two different actions that the jury could consider obstruction, the running away when there was a lawful stop, and then the actions in the home." Counsel asked the court to require the prosecutors to "specify which action they believe[d] [wa]s the obstruction so the jury c[ould] agree based on what orders were given to" Garcia.

¶ 27 In ruling on Garcia's motion, the district court rejected the prosecutor's argument that "the totality of [Garcia's] conduct" interacting with police constituted obstruction. The court reasoned that the only conduct sufficient to sustain the charge happened

when Garcia was sitting on his sister's couch, police told him he was under arrest and to put his hands behind his back, and he physically interfered with that law enforcement order "by hiding his hands or tucking them under his body in a way that the deputies had to wrestle his hands out to ultimately place him into custody." The court ordered the prosecutor to limit his argument accordingly.

¶ 28     In closing, the prosecutor made the following argument regarding the obstruction charge:

> And once the police arrived, [Garcia said,] "fuck you." He walked away. He went into his sister's home. *And he obstructed being arrested by trying to put his hands into his body so they couldn't get him handcuffed.*
>
> . . . .
>
> You heard [the deputies] both testify consistently that after Mr. Garcia yelled "fuck you" and walked away, they ultimately were able to get in contact with him. And when they did it was not a peaceful contact. *It was a contact where Mr. Garcia was actively trying to keep his hands under his body, actively trying to prevent himself from being arrested, being handcuffed. That is obstruction. That is physical obstruction of not letting officers do their job in the line of duty.*
>
> And . . . he continued to be belligerent. He continued to scream obscenities and bang his head against a partition of a police car.

(Emphasis added.)

### B. Applicable Law and Standard of Review

¶ 29     Section 16-10-108, C.R.S. 2025, requires that "[t]he verdict of the jury shall be unanimous." Accordingly, the prosecution "may be compelled to select the transaction on which [it is] relying for a conviction" if it "presents evidence of multiple discrete acts, any one of which would constitute the offense charged, and there is a reasonable likelihood that jurors will disagree regarding which act was committed." *People v. Archuleta*, 2020 CO 63M, ¶ 21. Alternatively, if the prosecution does not select a single transaction, the defendant may be entitled to a modified unanimity instruction, requiring the jury to "unanimously agree as to a specific act or agree that the defendant committed all the acts alleged." *People v. Manier*, 197 P.3d 254, 258 (Colo. App. 2008). But "[n]either a prosecutorial election nor a modified unanimity instruction is required . . . when a defendant is charged with engaging in a single transaction of criminal conduct and the prosecution proceeds at trial on that basis." *Archuleta*, ¶ 23.

¶ 30 "We review de novo whether a court erred by failing to require an election or give a unanimity instruction." *People v. Ryan*, 2022 COA 136, ¶ 15.

### C. The District Court Did Not Err by Declining to Do More to Ensure Juror Unanimity on the Obstruction Charge

¶ 31 As best we understand, Garcia contends that the district court erred by failing to either require the prosecution to elect which act constituted obstruction or give the jury a modified unanimity instruction. We conclude that the court did not err.[3]

¶ 32 A person obstructs a peace officer if, "by using or threatening to use violence, force, physical interference, or an obstacle, such person knowingly obstructs, impairs, or hinders the enforcement of the penal law or the preservation of the peace by a peace officer, acting under color of his or her official authority." § 18-8-104(1)(a), C.R.S. 2025.[4]

---

[3] The People argue that Garcia waived or forfeited this issue. We are not convinced there was a waiver, *see People v. Rediger*, 2018 CO 32, ¶ 46 ("[W]e must indulge 'every reasonable presumption *against* waiver.'" (citation omitted)), and we need not address the alleged forfeiture because we perceive no error.

[4] A prior version of section 18-8-104, C.R.S. 2025, was in effect at the time of Garcia's arrest, but the operative language cited here remains the same. *See* Ch. 462, sec. 272, § 18-8-104, 2021 Colo. Sess. Laws 3194.

¶ 33    Like the district court, we reject Garcia's contention that the prosecution presented evidence of multiple acts for which Garcia could have been convicted of obstruction.  Our review of the record reveals only one such act: Garcia's efforts to conceal his hands while the officers attempted to place him under arrest inside his sister's trailer.  Neither Garcia's cursing and walking away from the officers nor Garcia's conduct following his arrest could serve as the basis of that charge.  *See Dempsey v. People*, 117 P.3d 800, 810-11 n.14 (Colo. 2005) (explaining that nonthreatening verbal opposition or walking away from law enforcement officers does not constitute obstruction); *see also* § 18-8-104(1.5) (One does not commit obstruction by stating "a verbal opposition to an order by a government official.").[5]  Because the prosecution did not present "evidence of multiple discrete acts" that could serve as the basis of the prosecution's obstruction charge, neither an election nor a modified unanimity instruction were required.  *Archuleta*, ¶ 21.

---

[5] The quoted language was added by amendment after Garcia's arrest and is therefore inapplicable to his offense.  *See* Ch. 462, sec. 272, § 18-8-104(1.5), 2021 Colo. Sess. Laws 3194.

¶ 34    In reaching this conclusion, we necessarily reject Garcia's contention that the prosecutor argued that any one of three distinct acts could have been obstruction: (1) "walking away from police"; (2) "hiding his hands while being handcuffed"; and (3) "his behavior in the police car after arrest." The prosecutor argued only that Garcia's efforts "to keep his hands under his body, actively trying to prevent himself from being arrested [and] being handcuffed" constituted obstruction. True, the prosecutor explained that Garcia initially cursed at the officers and walked away before they tried to arrest him and then "continued to scream obscenities and bang his head against a partition of a police car" after he was arrested. But those acts were simply part of the story of what happened that day; the prosecutor never argued that walking away from the officers or banging his head in the patrol car amounted to obstruction.

¶ 35    In any event, the court's ruling on Garcia's motion for a judgment of acquittal — requiring that the prosecution argue only that Garcia's efforts to conceal his hands from police inside his sister's trailer constituted obstruction — effectively elected a single act for the prosecution. And, as discussed, the prosecution followed the court's order. Under these circumstances, we conclude

18

that the district court was not required to compel a prosecutorial election or to give a modified unanimity instruction to ensure juror unanimity. *See id.*

## IV. Prospective Juror Questionnaire

¶ 36 Garcia contends that the district court erred by denying his motion to include questions regarding race and implicit bias in the questionnaire distributed to prospective jurors. We disagree.

### A. Additional Background

¶ 37 Defense counsel moved pretrial to include questions concerning racial identity and implicit bias in the juror questionnaire.[6] Counsel argued that "[a] record of the race of every juror is . . . relevant and necessary for the preservation and litigation" of challenges under *Batson v. Kentucky*, 476 U.S. 79 (1986). Counsel also argued that "[g]iven . . . the much needed focus on race in America, . . . [t]he defense ha[d] an obligation to inquire into issues of racial bias to protect Mr. Garcia's rights to a

---

[6] Although Garcia also requested that the prospective jury watch a video concerning implicit bias, he does not raise the denial of that request as an issue on appeal, so we deem the issue abandoned. *See People v. Delgado*, 2019 COA 55, ¶ 9 n.3 (explaining that claims not pursued on appeal are deemed abandoned).

fair trial and an impartial jury." The prosecutor objected, arguing that including questions pertaining to racial identity and implicit bias would insert race into the juror fitness determination and that *Batson* explicitly recognized that "[a] person's race simply 'is unrelated to his fitness as a juror.'" *Id.* at 87 (quoting *Thiel v. S. Pac. Co.*, 328 U.S. 217, 227 (1946) (Frankfurter, J., dissenting)).

¶ 38    In a written order, the district court denied the request for a question addressing racial identity, explaining that defense counsel had not identified "any racial issues that [we]re 'inextricably implicated' in the subject matter of [Garcia's] trial" and that, "absent a policy decision such as a rule, statute, or Colorado Supreme Court decision requiring that such a question be included in a juror questionnaire," the question was not necessary. Concerning Garcia's request for a question regarding implicit bias, the court's order explained that counsel was "free to inquire about possible juror bias, prejudices, or stereotypes during jury voir dire" and that it was "open to a question on the juror questionnaire inquiring about possible racial stereotypes or bias." The court ordered Garcia to submit "a single question with no more than two subparts" for consideration.

20

¶ 39    Defense counsel proposed the following question:

> 1. Please circle the statement you agree with most and explain why:
>
>> a. Racial bias still exists in the United States OR Racial bias is exaggerated by the media
>
>> b. Explain why: _____

¶ 40    The court denied Garcia's request to include the proposed question in the juror questionnaire, explaining that a general inquiry into the juror's beliefs about the existence of racial bias "does not have a sufficient nexus to the issues in this case." The court again clarified that counsel could inquire "on voir dire into racial attitudes of the prospective jurors."[7]

¶ 41    Defense counsel began voir dire by asking whether any of the prospective jurors felt "like racial bias ha[d] been exaggerated in America," but, apparently, none of the prospective jurors responded affirmatively as counsel next said, "No." Counsel then asked whether anyone felt as though racial bias was "a prevalent issue" in

---

[7] Garcia's motion included an attachment with a list of proposed questions for the court's consideration. To the extent Garcia argues that the court erred by rejecting that list of questions, his argument is undeveloped on appeal, and we will not address it. *See People v. Liggett*, 2021 COA 51, ¶ 53, *aff'd*, 2023 CO 22.

America and then observed aloud that "most people [we]re raising their hands." Counsel then asked, "Does anybody . . . disagree with that statement and think that it is not a prevalent issue?" Again, none of the prospective jurors must have responded affirmatively because counsel moved on to inquire about other topics.

### B. Applicable Law and Standard of Review

¶ 42　Section 13-71-115(1), C.R.S. 2025, governs the information that trial courts must collect from prospective jurors through a standard juror questionnaire. Although the statute requires the court to ask questions related to specific categories of information (name, age, sex, family status, employment status, juror or legal history, etc.), it does not address whether the court may ask a prospective juror to identify their race or to answer questions concerning racial bias. *See id.* Instead, "the decision whether to permit additional questions of prospective jurors is committed to the trial court's sound discretion." *People v. Toro-Ospina*, 2023 COA 45, ¶ 32; *see* Crim. P. 24(a)(3). Again, a court abuses its discretion when its ruling is manifestly arbitrary, unreasonable, or unfair or when it misapplies the law. *Sims*, ¶ 44.

## C. The District Court Did Not Abuse Its Discretion by Declining the Proposed Questions on Race and Bias

¶ 43    Garcia contends that the district court abused its discretion by denying his motion to include questions concerning race and implicit bias in the juror questionnaire. He argues that including a racial identification question would have provided an objective basis for "the preservation and litigation of *Batson* challenges" and lessened the "danger of any actor incorrectly assuming race based only on superficial appearance." He also argues that the question pertaining to implicit bias was necessary because, as a Hispanic man, Garcia is "vulnerable to racial stereotyping and stigma." We are not convinced.

¶ 44    The district court did not misapply the law. Garcia fails to cite, and we are not aware of, any authority suggesting that a court errs by declining to include questions pertaining to race and implicit bias in the juror questionnaire. On the contrary, a division of this court has concluded otherwise. *See Toro-Ospina*, ¶ 37.

¶ 45    In addition, the court's rationale for declining the proposed questions was not manifestly arbitrary, unreasonable, or unfair. Although the court recognized that information about jurors' racial

identity could assist the defense in raising a prima facie *Batson* challenge, it was also concerned that such a question would unnecessarily inject race into jury selection and deliberation.[8] And while the court was mindful that racial biases exist, it was concerned that raising racial bias during jury selection would "risk[] exacerbating any possible prejudices without exposing them." These explanations reflect an appropriate exercise of discretion in weighing competing policy issues that have not yet been resolved by the General Assembly or the Colorado Supreme Court. *See Toro-Ospina*, ¶ 37.

¶ 46    Moreover, the court did not prevent Garcia from gathering the information he desired by other means, so the proposed questions were not necessary. Specifically, the court allowed Garcia to "present evidence or information gleaned through the jury selection

---

[8] Garcia contends that the district court's inclusion of information pertaining to gender bias in its closing instructions to the jury "serves as evidence of the arbitrary nature of the court's reasoning in this instance." We reject this argument for two reasons. First, Garcia asked to include questions in the juror questionnaire, not for an instruction following trial. Second, the referenced instruction is a model instruction, *see* COLJI-Crim E:01 (2024), and Garcia did not object to it, propose an alteration to include a caution against racial bias, or offer a separate instruction on racial bias.

process that the prosecution's [juror] challenge [was] racially motivated" in accordance with the approach contemplated by *Batson*, 476 U.S. at 96. And the court encouraged the parties "to inquire about possible juror bias, prejudices, or stereotypes during jury voir dire" — and defense counsel did just that.

¶ 47 Finally, as the court noted, Garcia does not explain how race was implicated by the facts of his case. Thus, we agree with the court's reasoning that, "[w]hile there may be a case in which racial identity [or implicit bias] should be part of a juror questionnaire, neither the arguments presented in [Garcia's] [m]otion nor the facts at issue warrant[ed] the inclusion in this particular case."

¶ 48 Accordingly, we conclude that the court acted within its discretion by denying Garcia's request to include questions pertaining to race and implicit bias in the juror questionnaire. *See Sims*, ¶ 44.

## V. Disposition

¶ 49 We affirm the judgment of conviction.

JUDGE FOX and JUDGE MEIRINK concur.

25